IN RE PUBLIC SERVICE ELECTRIC AND GAS COMPANY AND STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY *ADS.* BOROUGH OF ROSELLE—IN RE: INSTALLATION OF POWER LINE (P. U. C. DOCKET NO. 5612–9767).

IN RE PUBLIC SERVICE ELECTRIC AND GAS COMPANY—APPLICATION UNDER R. S. 40:55–50 THAT ZONING ORDINANCE OF BOROUGH OF ROSELLE DOES NOT APPLY TO POWER LINE (P. U. C. DOCKET NO. 576–10118).

THE BOROUGH OF ROSELLE AND THE COUNTY OF UNION, APPELLANTS, v. PUBLIC SERVICE ELECTRIC AND GAS COMPANY, STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY, BOARD OF PUBLIC UTILITY COMMISSIONERS, *ET ALS.*, RESPONDENTS.

PUBLIC SERVICE ELECTRIC AND GAS COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. BOROUGH OF ROSELLE, IN THE COUNTY OF UNION, STATE OF NEW JERSEY, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.

Argued December 5, 1960—Decided June 30, 1961.

*First-captioned cause:*

Mr. *Grover C. Richman, Jr.* argued the cause for appellants.

Mr. *Henry J. Sorenson* argued the cause for respondent Public Service Electric and Gas Company.

Mr. *Raymond J. Lamb* argued the cause for respondent Staten Island Rapid Transit Railway Company (*Messrs. Lamb, Langan and Blake,* attorneys).

*Second-captioned cause:*

Mr. *Robert L. Sheldon* argued the cause for appellant (*Messrs. Sheldon & Kaufman,* attorneys).

Mr. *Henry J. Sorenson* argued the cause for respondent.

The opinion of the court was delivered by

HALL, J. The controversy represented by these cases concerns the power of a municipality to compel a public utility to carry its high-capacity electric power lines, transmitting current for other than local use, through the municipality by underground installation rather than on overhead structures.

The effort by the Borough of Roselle was pursued on two fronts. The first involved an amendment of the local zoning ordinance adopted after construction of the transmission line in question had been commenced. Before the amendment the ordinance did not deal with the subject matter. The amendment required a utility to obtain a permit before erecting, in any zone in the borough, poles and towers for any transmission of electric current. The Board of Adjustment was vested with authority to hear the application and make recommendation to the governing body for issuance. Specifically it provided that no permit should issue unless both bodies found that in their judgment "the use in the case in question would not be detrimental to the health, safety

and general welfare of the community and is reasonably necessary for the convenience of the community."[1] Public Service Electric and Gas Company ("Public Service") sought exemption from the amendment with reference to this particular transmission line by instituting a proceeding with that object before the Board of Public Utility Commissioners ("Board") pursuant to *R. S.* 40:55–50 of the zoning enabling act. This proceeding is involved in the first-captioned cause. The statutory section empowers the Board to make a declaration of non-applicability if it finds that "the present or proposed situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."[2] It so found, after an extensive hearing.

Consolidated and heard with the Public Service application and likewise encompassed within the first-captioned cause, was a petition of the borough seeking converse relief,

[1] The technique resorted to appears to be that of permissive use of overhead transmission lines in all zoning districts, but only on specific allowance in each instance as a "special exception" if standards set forth in the ordinance are met. *N. J. S. A.* 40:55–39(b). See *Reinauer Realty Corp. v. Borough of Paramus*, 34 *N. J.* 406 (1961); *Schmidt v. Board of Adjustment of City of Newark*, 9 *N. J.* 405 (1952); *Tullo v. Millburn Township*, 54 *N. J. Super.* 483 (*App. Div.* 1959). It is to be noted that the standards are identical with those found in the ordinance in *Schmidt*, which there, however, related only to gasoline stations and public garages. In view of the much deeper issues on which these appeals must turn, we are not called upon to consider whether the technique is legally appropriate in this kind of situation or whether the quoted standards are proper or adequate.

[2] The section was adopted in 1928 when the *Constitution* (*Art.* IV, *sec.* VI, *par.* 5 added by amendment in 1927) and the general law (*R. S.* 40:55–30) authorized zoning with respect to buildings and structures only. The *Constitution of* 1947 (*Art.* IV, *sec.* VI, *par.* 2) extended the power to include uses of land as well, and the basic enabling statute was amended accordingly. *L.* 1948, *c.* 305. *R. S.* 40:55–50 has not been likewise expanded and it is unnecessary here to determine whether it should now be interpreted also to relate to utility uses of land not involving buildings or structures.

which was filed before the Public Service application but after the adoption of the zoning ordinance amendment. It sought to invoke exercise of the authority granted the Board by *R. S.* 48:2–19 of the public utility law, which provides:

"The board may:
a. Investigate upon its own initiative or upon complaint in writing any matter concerning any public utility; * * *"

The application asked investigation by the Board to determine whether Public Service should not be required to attain its objective of service through the overhead line in question by some other means such as underground transmission or use of an alternate route. It also asked the Board to determine whether the plans for the line contemplated provision for additional future service thereby without appropriate consideration of future development of engineering methods. The Board's single decision in both matters did not dispose of this petition on the merits, but the factors relied upon were essentially the same as those involved and passed upon in the zoning ordinance proceeding.

The borough and the County of Union, in which it is situated, appealed from the decision of the Board and we certified the appeal while pending in the Appellate Division on the motions of Public Service and Staten Island Rapid Transit Railway Company ("Staten Island"), another party to the zoning ordinance proceeding, under *R. R.* 1:10–1A.

The second front of the borough's continuing attack took the form of a general police power ordinance adopted after the final decision of the Board and the taking of the appeal therefrom in February 1960. This local legislation provided, in effect, that all electric power lines in Roselle carrying more than 33,000 volts must be installed underground. It went on to specify standards for such installation as well as the requirement of filing plans and specifications and the obtaining of a municipal permit before any such line could be lawfully constructed or maintained. Public Service immediately instituted an action in lieu of

prerogative writ in the Law Division attacking the validity of the ordinance.[3] This is the second-captioned cause before us. Public Service's motion for summary judgment was granted, the trial court holding that, as a matter of law, the ordinance was invalid as beyond the police power delegated to the municipality, because the Legislature had specifically committed the subject matter to the exclusive jurisdiction of the Board.

When the zoning ordinance appeal was first called for argument here we were advised of the pendency of the prerogative writ action and the imminence of decision in the trial court. Since both sides indicated an immediate appeal would be taken, whichever was the loser, we indicated that we would certify such an appeal on our own motion (*R. R.* 1:10–1(a)) as soon as taken and consolidate it for argument with the Board case so that all phases of the controversy might be finally disposed of at one time. The borough's subsequent appeal was so certified and the appeals argued together.

Discussion of the issues presented must be prefaced by some detail, common to both causes, concerning the particular transmission line involved. The foundation facts are not in dispute. Public Service furnishes electric service to the greater part of that portion of the State which is most densely populated and heavily industrialized. Its 14-county territory, in which it supplies light, heat and power to 1,400,000 customers, extends from Bergen County in the northeast, southwesterly to Camden County. This service area is about 106 miles long and its narrow width varies from 7 to approximately 24 miles. Production of electricity is by means of steam generating stations, which must be

[3] Apparently the borough also sought to block construction of the line under the authority of the local building code. In the prerogative writ suit, Public Service sought relief on this score as well. The trial court found that the provisions of the code were not, by their terms, applicable to overhead transmission lines. The borough has not presented the question here, so we need make no comment.

located where adequate supplies of condensing water are available and satisfactory arrangements can be made for necessary fuel deliveries. Public Service now has seven such generating stations. Those in the northern section are located in the eastern part thereof on waters in the general New York Bay area and those in the south are situate adjacent to the Delaware River in the western part of the section. The electricity produced must, of course, be carried by bulk transmission lines from the points of generation to the places throughout the territory where it is required for use. The entire system is integrated within itself, as well as interconnected with the systems of other utilities in adjoining areas and states, so that unusually heavy requirements or breakdown "outages" at a generating station or in a transmission line in a particular section may be immediately met by switching power from some other area.

The entire territory has in recent years experienced a phenomenal growth in population, commercial and industrial activity and home construction as well as in new and increased uses for electricity. This had resulted, even at the beginning of this controversy in 1956, in greatly increased demand for electricity and need for additional facilities to produce and relieve it. Predictions indicate a continuance of this expansion during the next several years. A utility must, in fulfillment of its obligation to furnish adequate service, construct facilities to be prepared to meet the present and prospective demand without fail. Such facilities must necessarily be geared, not to the average projected load, but to the possible peak load on the busiest day of the year. This time has changed in recent years from the winter months to the summer periods, due to the greatly increased use of electric cooling devices. Public Service has predicted a 45% increase in peak load by 1964 over that which actually existed in 1959, which in turn was substantially higher than the demand a few years earlier, and an even larger increase in the next five-year period. It estimated that by 1970 generation capacity required to serve this load would double

and that consequently additional bulk transmission facilities necessary to integrate the new capacity and deliver the energy in huge quantities to all parts of the service area must be provided.[4]

As part of the increased facilities necessary for the then present and expected future needs, Public Service by 1956 had put in operation a new generating station in Linden, capable at the time of generating 465,000 kilowatts but planned for later expansion to meet additional future demands. The location is about four or five miles southeast of Roselle. One of the places some of the power generated at Linden has to go to connect with the integrated system and serve needs of interior areas, even presently not adequately supplied by overloaded lines, is a switching station at Aldene in the Township of Cranford, just west of Roselle.

The line in question through Roselle is part of this link. It is proposed to run along and within the 100-foot-wide private right of way of Staten Island, an old, non-electric, freight railroad extending from Cranford to Staten Island. The right of way, some 9,000 feet in length in the borough, runs through the southern part of it in a northwesterly-southeasterly direction. While the railroad right of way itself does not appear to be included in any zone on the borough zoning map, it is bordered by an industrial zone for some 1,900 feet, a business zone for 400 feet and residence zones for the remainder of the distance. The evidence

---

[4] The borough, in the zoning ordinance case, sought to show that the estimates of Public Service as to the future need for generating and transmission facilities were unreasonably generous. The Board cast aside the suggestion:

"Since the future requirements of millions of customers cannot be predicted with precision, and since electricity is so vital a part of everyday existence, it appears only reasonable that planning should envision foreseeable contingencies and be of ample proportions to avoid any reasonable apprehension as to the sufficiency of supply to meet customer needs."

The Board's conclusion is indubitably correct. *Cf. In re Hackensack Water Co.*, 41 *N. J. Super.* 408, 425 (*App. Div.* 1956).

discloses that considerable portions of the adjoining residential zones still remain vacant for some distance from the track and that in other sections homes, many of recent construction, abut the right of way. It is to be noted that the community overall is substantially residential and for the most part well built up.

Public Service first proposed to carry the line through the borough, as in the other municipalities through which it had to pass, on 150-foot steel lattice-work towers. The uninsulated line is designed for ultimate 220,000 volt 600 megowatt capacity, but at inception is to carry only 132,000 volts. The type of transmission is a familiar one, frequently seen throughout the State, especially in sections not heavily built up. (Public Service last year had 405.4 circuit miles of such high voltage transmission lines supported by 1,852 steel towers in operation in some 79 municipalities within its 14-county territory.)

When Public Service commenced tower construction in Roselle in October 1956 the borough authorities directed the work to stop, although it is now conceded there was then no local legislation to support the command. The matter has been in litigation substantially since that event and the work has never resumed. We understand the line is practically complete except for the portion within the borough.

Immediately after the cessation of work, Public Service sought to resolve the controversy by offering to substitute H frame type structures for the 150-foot steel towers. Such structures are 70 feet high and each consists of a pair of columns connected by a rigid beam spanning the railway trackage, to which the power line would be attached. They are substantially the same in appearance and operation as those used on electrified railroads running through all types of land use areas in the State and would not differ from the construction necessary if Staten Island were to be electrified through Roselle. The negotiations were unavailing and the borough shortly thereafter adopted the amendment to its zoning ordinance and commenced its investigation

proceeding before the Board, which was in turn followed by the Public Service application for exemption from the provisions of the zoning regulation.

It is to be stressed that the latter application is based on the use of H frame structures and all proceedings below were had on that premise. We will likewise treat the matter and consider that Public Service no longer presses any claim to use the higher steel towers.

The borough's objections to overhead transmission of bulk power and the basis of its claim of right to compel an underground method are founded on an alleged adverse effect upon the safety and welfare of its inhabitants in these respects:

1. A hazard and danger to persons and property, especially when near to the route.

2. Depreciation of property values in the vicinity of such lines and destruction of the residential character of adjacent areas, which constitute as well a serious impediment to the further orderly development of the entire borough as a residential community.

3. Offensiveness of appearance of towers and lines.

4. Interference with family radio and television reception.

Roselle expressly concedes in its brief here an "obvious need for more electrical service for a larger area" and that "[t]he public welfare must be served in that respect." It does not attack, even if it had any standing or basis to do so, Public Service's decision to build a new generating station at Linden or a vital switching station at Aldene or the necessity for a direct, high-capacity line between these two points. In its petition for investigation, it asked the Board to determine that an alternate route be used, but, as the hearing developed, it became evident that no suitable alternate route outside the borough existed and that the Staten Island right of way was the only feasible one through it, either for overhead or underground transmission. The Board so found and that conclusion is not actually challenged before us. The borough's position therefore boils down to one of no claim of unreasonableness as to geographical location by use of the railroad right of way so

long as the current is carried underground. This amounts affirmatively to an assertion of municipal right to compel, by its own legislation of one type or another or through the state administrative process, a particular *method* of transmission by a public utility.

This brings us to a consideration of the precise points urged. Two of them, of a collateral nature, may be disposed of quickly.

■ The borough urged before the Board that Public Service was barred from seeking a determination of exemption from the zoning amendment because the agreement between the utility and Staten Island allowing use of the right of way for the power line was an encumbrance upon the railroad's property, had not been submitted to the Board for approval as required by *R. S.* 48:3–7 and was consequently void. The Board held that approval was not a condition precedent to relief under *R. S.* 40:55–50, and error in that conclusion is asserted here. We find no merit in the contention. The Board was unquestionably right. Moreover, such a defect cannot inure to the benefit of a third party in the position of the municipality. In any event, the question is now moot for the agreement was submitted and approved by the Board before the final termination of the matter there.

Mention has been made that the County of Union appealed to the Appellate Division from the Board's decision along with the borough. The county, although it had entered an appearance at the inception of the Board hearings, took little or no part therein until it joined the borough in a motion for rehearing and reconsideration of the decision (which was ultimately denied). Public Service moved in the Appellate Division, *inter alia,* to dismiss the county's appeal for lack of sufficient legal interest, relying on this court's decision in *Bergen County v. Port of New York Authority,* 32 *N. J.* 303 (1960). The motion was granted and we allowed certification on the county's petition, *County of Union v. Public Service Electric & Gas Co.,* 33 *N. J.* 329

(1960), at the same time we brought the whole Board case here on the merits pursuant to the motion of Public Service and Staten Island under *R. R.* 1:10–1A. The standing of the county to appeal is an entirely academic question and we need not decide it. It was represented on the rehearing application before the Board by counsel for the borough and the notice of appeal is signed by one attorney on behalf of both. The brief on the merits filed with us is again joint, signed by one attorney, who presented a single oral argument, pursuant to our direction that the matter be thoroughly presented without regard to the county's present technical status in the case. No claim is made of special or different county interests beyond those fully urged on behalf of the municipality itself, which, of course, has the primary and direct concern and which we treat accordingly in this opinion as the real party in interest.

To proceed to a consideration of the principal issues, we find it appropriate, by reason of the very fundamental nature of the question involved, to consider first the claim of error by the Law Division in striking down the police power ordinance which required underground installation of all transmission lines carrying more than 33,000 volts. We are firmly of the opinion the trial court properly decided the subject matter to be outside the scope of the municipal power by reason of legislative commitment thereof to the expertness and statewide authority of the Board of Public Utility Commissioners.

A municipality, being a creation of the State, has, of course, only such powers as are delegated to it by the State. The general grant of police power by *R. S.* 40:48–2 is a broad one. *Fred v. Mayor and Council, Old Tappan Borough,* 10 *N. J.* 515 (1952). This view of breadth is buttressed by the mandate of the 1947 *Constitution* that laws concerning municipalities be liberally construed in their favor. *N. J. Const. Art.* IV, *sec.* VII, *par.* 11; *State v. Mundet Cork Corp.,* 8 *N. J.* 359, 370 (1952), *certiorari* denied 344 *U. S.* 819, 73 *S. Ct.* 14, 97 *L. Ed.* 637 (1952). Nevertheless,

the power is restricted to those matters which are of purely local concern, and even where the State Legislature has not spoken, some matters, inherently in need of uniform treatment, are not a proper subject for municipal legislation. As this court said in *Wagner v. Mayor and Municipal Council of City of Newark,* 24 *N. J.* 467, 478 (1957):

"The broad grant of power * * * relates to matters of local concern which may be determined to be necessary and proper for the good and welfare of local inhabitants, and not to those matters involving state policy or in the realm of affairs of general public interest and applicability."

Moreover, and of greater importance here, this State has delegated in most sweeping terms "general supervision and regulation of and jurisdiction and control over all public utilities" and "their property, property rights, equipment, facilities and franchises" to the Board. *N. J. S. A.* 48:2–13. More specifically, the Board is empowered to direct utilities to furnish safe, adequate and proper service, *R. S.* 48:2–23, and to that end it may fix just and reasonable standards and practices. *R. S.* 48:2–25. We find in these statutes, and throughout *Title* 48 *of the Revised Statutes* (1937), a legislative recognition that the public interest in proper regulation of public utilities transcends municipal or county lines, and that a centralized control must be entrusted to an agency whose continually developing expertise will assure uniformly safe, proper and adequate service by utilities throughout the State. Our courts have always construed these legislative grants to the fullest and broadest extent. *E. g., Atlantic Coast Electric Railway Co. v. Board of Public Utility Commissioners,* 92 *N. J. L.* 168 (*E. & A.* 1918), appeal dismissed 254 *U. S.* 660, 41 *S. Ct.* 10, 65 *L. Ed.* 462 (1926); *O'Brien v. Board of Public Utility Com'rs,* 92 *N. J. L.* 44 (*Sup. Ct.* 1918), affirmed 92 *N. J. L.* 587 (*E. & A.* 1919); *Perth Amboy v. Board of Public Utility Commissioners,* 98 *N. J. L.* 106 (*Sup. Ct.* 1922); *In re Central Railroad Co.,* 30 *N. J. Super.* 520 (*App. Div.* 1954).

██ Where the state has thus established an agency of its own with plenary power to regulate utilities, it is universally recognized that municipalities cannot properly interpose their local restrictions unless and only to the extent any power to do so is expressly reserved to them by statute. *City of Geneseo v. Illinois Northern Utilities Co.*, 363 Ill. 89, 1 N. E. 2d 392 (*Sup. Ct.* 1936); *Jennings v. Connecticut Light and Power Co.*, 140 Conn. 650, 103 A. 2d 535 (*Sup. Ct. Err.* 1954); 12 *McQuillin, Municipal Corporations*, § 34.09 and § 34.146, at *pp.* 429–430 (1950); 43 *Am. Jur., Public Utilities* § 194; Annotation, *Public Service Commission*, 5 A. L. R. 36, 37 (1920), supplemented in 39 A. L. R. 1517, 1519 (1925). And this notwithstanding broad "home rule" powers in the municipality. *People ex rel. Public Utilities Commission v. Mountain States Tel. & Tel. Co.*, 125 Colo. 167, 243 P. 2d 397 (*Sup. Ct.* 1952). The cases of *State ex rel. Cleveland Electric Illuminating Co. v. City of Euclid*, 169 Ohio St. 476, 159 N. E. 2d 756 (*Sup. Ct.* 1959), adhered to on reconsideration, 170 Ohio St. 45, 162 N. E. 2d 125 (*Sup. Ct.* 1959), appeal dismissed 362 U. S. 457, 80 S. Ct. 873, 4 L. Ed. 2d 874 (1960), relied upon by the borough, and *Benzinger v. Union Light, Heat & Power Co.*, 293 Ky. 747, 170 S. W. 2d 38 (*Ct. App.* 1943), which found power in the municipality to require electric companies to place their electric transmission lines underground, are not exceptions to the rule. Rather, in both of those cases the courts found express statutory reservation of the requisite authority in the municipalities.

Our inquiry then is narrowed to a search for statutory authority to justify this Roselle ordinance, which attempts to do nothing less than regulate the method of transmission of high voltage power. We fail to find any. While some reservation of municipal control over the installation of overhead power lines and underground cables may be found in *R. S.* 48:7–1 and 2, this control is limited to a requirement of municipal consent where an electric company desires to use *public streets* for the construction of overhead

or underground lines, obviously for service to local residents. Such is not the situation here. See *Long Island Lighting Co. v. Village of Old Brookville*, 84 *N. Y. S. 2d* 385 (*Sup. Ct.* 1948), in which the court found it beyond municipal authority to require underground electrical conduits where the utility had acquired a right of way over private property, while at the same time leaving open the possibility of similar regulation where the electrical lines were to run along public streets. Even in the latter situation in New Jersey the courts have closely scrutinized the reasonableness of municipal restrictions, a matter with which we need not concern ourselves in view of the basic lack of authority for this local action. See *Rockland Electric Co. v. Borough of Montvale*, 104 *N. J. L.* 480 (*Sup. Ct.* 1928), where the question presently under discussion was not reached; *cf. Hackensack Water Co. v. Ruta*, 3 *N. J.* 139 (1949).

It is rather difficult to conceive of a subject which more requires uniform regulation at a high and broad level of authority than the method of transmission of electric power, especially where it must be generated in a single location and distributed and used in many and distant places. Were each municipality through which a power line has to pass free to impose its own ideas of how the current should be transmitted through it, nothing but chaos would result, and neither the utility nor the state agency vested with control could be assured of ability to fulfill its obligations of furnishing safe, adequate and proper service to the public in all areas. The matter is clearly one for Board control alone, which it has exercised (see Regulations, Board of Public Utility Commissioners, Oct. 1, 1960, secs. 14:402–1 and 14:432–1). This Roselle ordinance is clearly beyond municipal power.

This brings us next to a consideration of the borough's appeal from the Board decision granting Public Service exemption from the provisions of the zoning ordinance amendment under *R. S.* 40:55–50. This exemption section expresses a legislative intent that, in the zoning field, at least

some power over a utility is reserved to a municipality, subject to the supervising authority of the Board to declare the local regulation inapplicable if it determines "the situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."

Perhaps at this point it would not be amiss to say something, from the standpoint of municipal power, about the legal comparability of this Roselle zoning ordinance amendment and what we have called the borough police power ordinance, even though the parties have not discussed the matter, undoubtedly because of the chronology of events and the way in which the issues were therefore naturally raised below and presented here. There is a striking similarity in purpose and effect between the two regulations. Each basically seeks to assert municipal control over the method of transmission of electric power anywhere within the borough, the first by an absolute prohibition of overhead transmission of more than 33,000 volts, and the second by requiring municipal permit for any tower transmission under standards of local agency judgment confined to detrimental effect upon or necessary convenience of the single community. If, as we have held, the prohibitory legislation is bad for the reason we have given, it is difficult to see why the permissive regulation is not also basically invalid for the same reason.

It would seem to make no difference that the latter was enacted under the guise of zoning legislation. After all, zoning is fundamentally municipal legislation under the police power directed to land use regulation (*N. J. S. A.* 40:55-30) for purposes (*R. S.* 40:55-32) akin to those which may found the exercise of the power in other situations. Considerable regulation commonly found in zoning legislation could as well, or perhaps more properly, be validly imposed by separate enactment, not by name tied to the zoning ordinance. Conversely, inclusion of such a regulation within the confines of the zoning ordinance does not *ipso facto* clothe it with validity which it would not otherwise have. *Cf. Marie's Launderette v. City of Newark, 35 N. J. Super.*

94 (*App. Div.* 1955), where the court held invalid a provision of a zoning ordinance prohibiting pick-up or delivery of clothing by launderettes. Moreover, and of particular significance here, calling something "zoning" cannot cloak a municipality with power to act in a field and in a way which is otherwise foreclosed ˙to it by supervening state legislation or policy. *Cf. Town of Bloomfield v. New Jersey Highway Authority,* 18 *N. J.* 237 (1955). This concept seems to be inherent in and to underlie the provisions of *R. S.* 40:55–50, enacted after the public utility act which had given to the Board full control over utilities. Consequently it might cogently be suggested that any zoning power over utility land uses reserved to a municipality (and even then subject to the exemption authority of the Board) is necessarily confined to matters such as mere physical "situation" of a building or structure, like a telephone exchange building, truck garage or water tank,[5] where the applicable regulation does not go to the extent of amouting to attempted local regulation substantially affecting the method of operation and functioning of the utility, and that the borough zoning amendment in question went beyond this pale. However, Public Service did not attack the amendment, but sought exemption from it, and so our review of the Board's decision will be had within that framework.

All parties agree, and we concur, that *R. S.* 40:55–50 is to be construed and applied in accordance with the principles and reasoning set forth in *In re Hackensack Water Company,* 41 *N. J. Super.* 408 (*App. Div.* 1956), the only prior appellate court decision involving the section, although involved there was only the matter of geographical location of a single structure (water tank) at a precise spot in a single (residential) zone.

Roselle claims that the Board did not properly take into account and apply to the evidence the criteria set forth in *Hackensack* and incidentally failed to make specific findings

---

[5] Compare footnote 2, *supra.*

of the basic, as distinct from the ultimate, facts. It seems to us, from the borough's argument, the contention really is that the body of the decision does not suport the conclusion and that the opposite result should have been reached on the evidence because the Board did not properly consider and weigh the local interests involved.

We are confined, in judicial review of an administrative determination, by well settled rules summarized, in the context of this statutory section, in *Hackensack*:

"The court concerns itself with whether there has been any violation of the State or Federal Constitutions, whether the result is within and in accordance with the legislative grant and the standards prescribed thereby, and whether there has been fraud, bad faith, or manifest abuse of discretion in the sense of unjustly discriminatory, arbitrary, or capricious action. *In re Sanders*, 40 *N. J. Super.* 477, 483 *(App. Div.* 1956). Any review of the facts must be confined to the question of whether they are supported by substantial evidence, *i. e.*, such evidence as a reasonable mind might accept as adequate to support a conclusion. *In re Plainfield-Union Water Co.*, 14 *N. J.* 296, 307 (1954) ; *In re Central Railroad Co. of New Jersey*, 29 *N. J. Super.* 32, 38 *(App. Div.* 1953) ; *In re Sanders*, *supra; Hornauer v. Division of Alcoholic Beverage Control*, 40 *N. J. Super.* 501 *(App. Div.* 1956). The rule has also been expressed as confinement to an inquiry of 'ascertainment of whether the evidence before the board furnished a reasonable basis for its action.' *In re Greenville Bus Co.*, 17 *N. J.* 131, 137 (1954) ; *New Jersey Power & Light Co. v. Borough of Butler*, 4 *N. J. Super.* 270, 279 *(App. Div.* 1949). *Cf. R. S.* 48:2–46. It is soundly and frequently stated that a reviewing court should not substitute its independent judgment for that of the administrative tribunal where there is 'a mere difference of opinion concerning the evidential persuasiveness of relevant testimony.' *In re Sanders*, *supra*, 40 *N. J. Super.*, at *page* 483. The rule-given power (*R. R.* 4:88–13) to review facts and make independent findings as the interests of justice may require, in effect, a trial *de novo*, should be most cautiously invoked. *In re Larsen*, 17 *N. J. Super.* 564, 577–578 *(App. Div.* 1952)." (41 *N. J. Super.*, at *pp.* 418–419)

We need not fully repeat the rationale developed in *Hackensack*, but it may be well to recapitulate briefly the criteria of interpretation there laid down:

1. The statutory phrase, "for the service, convenience and

welfare of the public" refers to the whole "public" served by the utility and not the limited local group benefited by the zoning ordinance.

2. The utility must show that the proposed use is reasonably, not absolutely or indispensably, necessary for public service, convenience and welfare at some location.

3. It is the "situation," *i. e.,* the particular site or location (here the railroad right of way, as the Board said), which must be found "reasonably necessary," so the Board must consider the community zone plan and zoning ordinance, as well as the physical characteristics of the plot involved and the surrounding neighborhood, and the effect of the proposed use thereon.

4. Alternative sites or methods and their comparative advantages and disadvantages to all interests involved, including cost, must be considered in determining such reasonable necessity.

5. The Board's obligation is to weigh all interests and factors in the light of the entire factual picture and adjudicate the existence or non-existence of reasonable necessity therefrom. If the balance is equal, the utility is entitled to the preference, because the legislative intent is clear that the broad public interest to be served is greater than local considerations.

Our review of the voluminous record of the hearing before the Board convinces us beyond any doubt that it properly took into account and appropriately applied all relevant criteria, that it thoroughly weighed all interests in the light of all facts and circumstances presented to it by the evidence, that necessary findings were adequately made and that its conclusion of reasonable necessity is supported by such evidence as a reasonable mind might accept as sufficient, considered within the compass of the applicable law.

To deal with specifics, we have already mentioned (see footnote 4, *supra*) the Board's finding and the adequacy of evidence to support it, approving as proper Public Service's estimate of need in the near future for 220,000 volt 600

megawatt transmission from Linden to Aldene, there to be divided and sent in diverse directions to other parts of the integrated system by lower capacity lines. Thus was established without question reasonable necessity for the line in some location between the two places. Likewise we have earlier referred to the finding, based on sufficient evidence, that no suitable alternate route existed outside the borough and that the Staten Island right of way was the only feasible one through it, thereby disposing of any problem as to the reasonable necessity for the particular "situation."

The principal controversy before the Board concerned the alternate method of transmission insisted upon by the borough, *i. e.,* by underground cable within the railroad right of way. There was no dispute in the technical testimony offered by both sides that, while a 220,000 volt cable can be produced in the state of present scientific knowledge, the art has not advanced to the point where such a cable can have a capacity of more than 368 megawatts, since it must be insulated, as contrasted with bare overhead wire. While a single cable would suffice for the lower amount of current to be transmitted at the moment, a second one would shortly have to be installed, as the Board indicated, to supply the increased demand Public Service must meet within the next few years. In addition, a single cable would not permit the occasional present necessity for the transmission of loads greater than normal to compensate for the interruption of other transmission channels due to ordinary maintenance or emergency requirements.

The factor of cost differences was considered by the Board to be an important one, ultimately reflected in the consumer's service bill. The H frame construction is itself more expensive than the use of lattice-work towers, and underground installation entails even greater outlay. Roselle's own expert estimated that a single underground cable would cost $366,000 more than H frame installation through Roselle alone and the Public Service figure was still higher. The Board reasonably found from the evidence that, for 600

megawatt capacity, underground installation would cost some 3.6 times as much as H frame construction and 4.5 times more than high lattice-work towers. While it is obvious that this factor bulked large in the Board's weighing of the respective interests, as it should have, study of the whole decision makes it clear that it was not in itself decisive or that a lack of due consideration of the borough's interests resulted.[6]

It is evident to us that the Board did properly balance the special municipal interests advanced and we cannot say that its conclusion that they were outweighed by the broader public considerations under all the facts and circumstances was an arbitrary or unreasonable one. The evidence relating to adverse effect on the value and enjoyment of local property caused by the appearance of the overhead structures and related factors was indicated not to be persuasive in the borough's favor. It must not be forgotten in this connection that the proposal involved railroad electrification type frames, not steel towers 150-feet in height, and these along trackage already cutting through the town. Similarly, it is apparent from the decision that the Board was not impressed with municipal testimony of a vague nature suggesting possible interference with radio and television reception, especially in the light of utility evidence of no case of such complaint caused by high voltage lines for the past 10 years.

The understandable and important local interest in safety received considerable attention from the Board. While it pointed out accidents can happen, it stressed utility testimony that the utmost in safety precautions had been designed into the proposed line, including the unclimbable nature of the H frame structures and the use of automatic de-energizing

---

[6] It was also pointed out at oral argument that underground line breaks, while less frequent, are much more difficult to locate and require much more time to repair and restore to service than in the case of overhead transmission. This undisputed fact was contained in the testimony though not mentioned in the Board decision.

apparatus to operate in the event of a fallen wire. The evidence was uncontradicted that Public Service had never experienced a case of physical injury or death due to a fallen high voltage transmission conductor. We cannot say, under this state of facts, that it was unreasonable or capricious for the Board not to conclude the overhead installation was not reasonably necessary for the public interest because of the remaining possibility of accident.

The borough also urged it was being treated less favorably than other municipalities since an existing line from Aldene to West Orange had been recently installed underground. As the Board pointed out, in rejecting the claim as a basis for decision in favor of the municipality, the route of that line is such that the obtaining of a right of way for overhead construction was not feasible or practical and "this would be equally true as far as Roselle is concerned were it not for the availability of the railroad right of way."

Finally, under this head, we think the findings of basic fact in the Board's decision are sufficient and, considering the scope of judicial review, adequately support the ultimate conclusion. See our comments on the same question in the somewhat analogous case of *In re Howard Savings Institution*, 32 *N. J.* 29, 52–55 (1960).

The last phase of the controversy requiring consideration relates to the borough's petition to the Board for investigation under *R. S.* 48:2–19, which had no essential basis in any local legislation. As we have stated, the Board did not dispose of this proceeding on the merits. In fact, the Examiner's report, adopted by the Board as its decision, said:

"* * * does the Board have authority to require PS to install its transmission facilities underground or to designate a different route if the construction is to be installed overhead? It is your Examiner's opinion that the Board has no such authority under the circumstances here and he so finds. Our statutes place a duty upon a public utility to render safe, adequate and proper service and authorize this Board to promulgate regulations setting up standards in this regard. However, the selection of specific designs and ma-

terials to meet the utility's obligation aforementioned and related regulations is generally regarded, absent arbitrary or capricious action, to be within the functions of utility management rather than within the scope of this Board's authority."

The borough does not urge that this determination was error, merely arguing that the conclusion thus expressed unfavorably colored the Board's consideration of the factors and interests involved in the proceeding for exemption from the zoning ordinance. We fail to find evidence of any such effect in the Board decision. In addition, even if it were in error with respect to its powers in this regard, it appears to us that identical considerations and approach would be involved and the same balancing of interests required as was had in the zoning ordinance case. Both parties tried the consolidated case as if the Board had the power which it finally denied itself and the evidence introduced was equally applicable to both aspects of the case. We are convinced the scope of judicial review would be the same and our conclusion no different from that here expressed in relation to the zoning exemption proceeding.

So, in view of the absence of argument on the question, we express no opinion beyond this further comment. The Board's view of its own power may be too narrow in the instant context. *Cf. Pennsylvania Railroad Co. v. Department of Public Utilities,* 14 *N. J.* 411, 425–426 (1954). It has an inherent obligation of a primary and fundamental nature to protect the public interest in the matter of service by utilities, not only in relation to the customer, but also from the standpoint of the impact of the method of service on other segments of the public as well, and it must always be affirmatively alert to discharge that responsibility. For example, if there were no applicable local zoning regulation in a particular community by which there could thereby be brought before the Board a claim that the local interest was great enough in the particular circumstances to dictate underground rather than overhead transmission, it may well be that the Board has the power to require such installa-

tion and that procedurally the matter could be brought before it by the mechanics of *R. S.* 48:2–19.

The decision of the Board of Public Utility Commissioners and the judgment of the Law Division are affirmed.

No. A–34:

*For dismissal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*Opposed*—None.

Nos. A–35, A–35a:

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.