# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5101-18T1

SONIA DOE, A PSEUDONYM,

    Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

    Respondent.

_____

Argued telephonically April 1, 2020 –
Decided June 3, 2020

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the New Jersey Department of Corrections.

Tess Borden argued the cause for appellant (American Civil Liberties Union of New Jersey Foundation and Pashman Stein Walder Hayden, PC, attorneys; Tess Borden, Jeanne LoCicero, Alexander Shalom, Roger Plawker, and James Boyan, on the briefs).

Christopher C. Josephson, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Donna Arons, Assistant

Attorney General, of counsel; Christopher C. Josephson, on the brief).

PER CURIAM

Sonia Doe,[1] a transgender woman, was an inmate housed at Northern State Prison (NSP), a male prison.[2] An Associate Administrator of the New Jersey Department of Corrections (NJDOC) upheld a disciplinary hearing officer's decision finding Doe guilty of committing prohibited acts *.002, assaulting any person, N.J.A.C. 10A:4-4.1(a)(1)(ii); and *.306, conduct which disrupts the orderly running of the corrections facility, N.J.A.C. 10A:4-4.1(a)(2)(xxix). Doe was sentenced to an aggregate 270 days of administrative segregation, 270 days of lost commutation time, and 30 days lost recreation time and appealed. For the reasons that follow, we affirm the disciplinary determination but remand for reconsideration of the sanction.

---

[1] We granted appellant's motion to proceed under a pseudonym for good cause finding her privacy interests outweighed the presumption of a public record under Rule 1:38. R. 1:38-11(b)(2).

[2] Doe is currently housed at the Edna Mahan Correctional Facility for Women (EMCF) and as of May 15, 2020, her NJDOC public search profile listed her gender as "F." During the time Doe was housed in NSP, Doe's gender was listed as "M." As we discuss the record under review, certain references to Doe appear as "he," "him," and "his." We only use those pronouns to accurately reflect the statements NJDOC officers made in the record. In doing so, we mean no disrespect.

We discern the following facts and procedural history from the record. Doe has been in the custody of the NJDOC since March 2018. The charges that are the subject of this appeal occurred on May 24, 2019. Prior to that date, on April 30, Doe requested a gender identity dysmorphia (GID) transfer to Edna Mahan Correctional Facility for Women (EMCF). The request was forwarded to the Prison Rape Elimination Act[3] (PREA) unit for processing. On May 12, Doe filed a grievance because she felt threatened in her housing assignment.

On May 24, Shift Commander Lt. A. Washington asked Lt. N. Rodriguez to interview Doe regarding her grievance. Doe was escorted to an office for the interview. Rodriguez ordered Ofc. S. Roberts to conduct a pat-down of Doe, during which Doe suddenly stepped away from Roberts. Doe and the various NJDOC officers involved have slightly differing accounts of what happened, but it is clear a physical altercation between Doe and the officers ensued, and Doe was charged with *.002, assaulting any person, and *.306, conduct which disrupts. The various accounts, through reports, confrontation, and statements, are as follow.

---

[3] 34 U.S.C. § 30301.

Reports prepared by Sergeant D. Kuperberg, Ofc. Roberts, Ofc. J. Lantigua, and Sgt. E. Hernandez were consistent with Rodriguez's report. Rodriguez reported she was in the sergeant's office waiting to conduct an interview with Doe about her grievance, and that Roberts escorted Doe there. Rodriguez ordered Roberts to conduct a pat-down in the adjoining hallway before Doe entered, and when Roberts began the pat-down, Doe "abruptly moved his body stating, 'What the fuck, he can't touch me I am a woman.'" Rodriguez ordered Doe to place her hands on the wall, and Lantigua then arrived. Rodriguez was then able to deescalate the situation and gave Doe specific orders to comply, which Doe did.

Rodriguez told the officers to "let him take a seat," after which Doe "became visibly upset saying 'I told you I was a woman'" with a raised voice and "his face suddenly became red and he began shaking his knee." Rodriguez told Doe to calm down and tried to tell Doe why she was called for the interview, and Doe "began screaming, 'I don't care. I don't care. I'm going to fucking tell them it's PREA.'" According to Rodriguez, Doe jumped from the chair and lashed at Roberts hitting him in the face, after which Rodriguez

called a Code 33,[4] and Roberts and Lantigua tried to "gain compliance" from Doe while Doe "repeatedly swung his arms and kicked his feet towards them." Rodriguez reported she ordered Doe to stop resisting several times, Lantigua used his OC[5] to gain compliance, and the use of force succeeded in securing Doe with handcuffs. Roberts filed a report consistent with Rodriguez's account, as did Lantigua.

The hearing was conducted June 20, 2019. Counsel Substitute previously submitted a request for a polygraph examination as permitted under N.J.A.C. 10A:3-7.1, which was denied, as was a request for video near the incident, because there was no video of the assault area. Doe requested and was granted confrontation as to Lantigua, Rodriguez, and Roberts in accordance with N.J.A.C. 10A:4-9.14.

On June 14, 2019, Doe submitted confrontation questions for Rodriguez, Roberts, and Lantigua. Rodriguez responded she was assigned to interview Doe regarding Doe's grievance, which was why Doe was called to the area, that she ordered an officer to pat-down Doe for security, and that she did not

---

[4] Code 33 is called when there is an emergency situation in the prison, including an assault on staff, and an officer at the scene needs assistance.

[5] Oleoresin Capsicum (pepper spray).

know whether Doe passed through a metal detector for clearance into the building. Rodriguez reported seeing Doe "push[] away from the officer" conducting the pat-down. She stated Doe did not complain the pat-down was violating her private areas, and the charge for assault was written because Doe jumped out of her seat and swung at Roberts' face and made contact. She described Doe as striking Roberts with her right hand and said the officers exercised the "proper use of force" to gain compliance from Doe.

Roberts reported he was directed to search Doe, he did not improperly search or touch Doe during the pat-down, the pat-down followed NJDOC procedures, Doe did not complain she was violated during the pat-down, and that Doe "jumped up, swung his right hand and hit [Roberts] in the side of the face left side."

As for Lantigua, he reported being present, standing in the hallway, when Doe was ordered to be searched, that he did not know if there was a particular reason for the pat-down, and that Doe complied with the order to submit to the pat-down "after the second time." Lantigua described Doe strike Roberts, with a fist on the left side of Roberts' face, and he and others used physical and mechanical force to gain compliance.

A-5101-18T1

All three were asked (1) "[w]ere you aware that [Doe] identified as a female, or transgender person?", and (2) "at any[]time prior to this meeting with [Doe], were you aware of any specific policy on searching a transgender inmate?" The questions were deemed irrelevant.

Doe submitted her statement stating she was called down and directed into the staff-only section through a "small hallway of supervisors['] offices" until reaching one in the back. Rodriguez was seated at the desk and told her to sit down, and then said "wait, pat him down first" to Roberts, to which Doe replied "her" in response to being called "him," which she asserted was a violation of NJDOC policy PCS.001.006 pertaining to the treatment of transgender inmates.

Doe reported she assumed the proper position for Roberts to conduct the pat-down, but during the pat-down Roberts

> squeezed and caressed my breast in an in[]appropriate manner. I took a two-inch step backward and leaned back in order to see [Rodriguez] . . . and said "whoa, he's groping me." Rodriguez leapt from her chair and yelled in command tone "no, we don't do that here! You don't move one inch when being searched, do you understand?"

Doe responded, "Yes, but I wasn't being searched, he was fondling my breasts," and Rodriguez said, "Put your hands on the door, search him again.

Him, notice I said him? You're a man, you don't have breasts, this is a male prison, you're a he. That's how we do searches, this is [NSP], and that's how we do things here."

Roberts searched her again "how men get searched touching my breasts but without the extra touch as before." Doe then sat in the chair beside Rodriguez's desk and told Rodriguez she would report the incident, and Rodriguez then replied "you know what else we do at [NSP]? Go ahead and show him." Doe alleged Roberts "began punching me in the face with [another officer] quick to follow," and that she "somehow got from the seated position in the chair to the fetal position on the floor while being beaten by all three [officers]. It seemed like forever before I heard [Rodriguez] say 'Code 33' over her radio." Doe asserted she was sprayed heavily in the face with OC while still on the ground in the fetal position, and that someone struck her with a baton "several times. Once in the [right] elbow, once in the [right] knee, once in the back, and once more on the outside of both hands," and asserted she was in the fetal position and did nothing but cry and beg them to stop the entire time.

Doe said she was eventually placed in handcuffs, was held over a trashcan while she bled, and "[a]s [Doe's] face was leaking blood into the trash

an [officer] went to grab a handheld video camera." She stated she asked for a doctor, for ibuprofen, for her emergency contact and attorney to be notified, and to shower off the OC, all of which were denied.

A doctor came to see her after a few days and ordered x-rays of Doe's face, elbow, knee and back, CT scans of her face, and an MRI of her lumbar spine. Doe asserted the doctor's initial report "concluded [she] had sustained serious injury including a broken nose, fractured jaw, and poss[ible] damage to [her] spine, and nerves in [her] hand," and asserted she still experienced numbness and tingling in her fingers. A week after the incident she was allowed to shower all of the OC off her hair and skin.

Doe argued the three witnesses lacked credibility because of "overwhelming divergence and inconsistency of testimony revealed at the confrontation hearing." She argued it was "beyond belief" that Rodriguez would not know if an inmate had been cleared by the metal detector, as inmates are not allowed to pass through the area without doing so and are then physically searched if the metal detector detects something. Doe further asserted that Rodriguez's answer that she was told to interview Doe regarding her grievance was pretextual and supported Doe's contention she was lured to the room with no camera so that staff could assault her.

A-5101-18T1

She also cited alleged inconsistencies in that: Roberts did not mention a second search; Roberts said Doe hit him with a closed fist, hitting him on the left side of his face but then stated his only injury was a "contusion to his right hand"; photos of Roberts reveal his knuckles were swollen from beating Doe and the photo of his face did not reveal injuries; and that Roberts "appears to be over six feet tall" where Doe is five feet six inches. She also asserted Lantigua gave inconsistent stories that: he saw Roberts punched on the "right side of his face" and was only present during the "second search," whereas there is nothing in any report about a second search and he said he was not there during the search; and that he stated in his report that Doe was "swinging wildly numerous times" whereas at the hearing he testified to a "single punch." Doe asked the hearing officer to reject the account of the three witnesses and dismiss the charges.

On June 20, 2019, Doe was adjudicated guilty of *.002, and the summary of evidence relied on states Doe

> [p]leads not guilty, offers no statement, no evidence to contradict Part A, staff reports [Doe] became combative and struck Ofc. Roberts in the face with a closed fist. D1 [Doe's statement] noted, provides no evidence to mitigate or exonerate.
>
> . . . .

[Doe] already referred for PREA. No . . . to note, prior assaultive disciplinary . . . noted (staff assault), to deter staff assaults, [Doe] refuses to be accountable [or] take responsibility for actions.

. . . .

Confrontation provided no information [or] evidence to discredit Part A, staff reports indicating [Doe] struck Ofc. Roberts. D3 [counsel substitute statement] provides no evidence to mitigate or exonerate. Refuted by evidence provided. Charge as written has merit. All relied on.

Doe was sanctioned to 270 days of administrative segregation, 270 days of lost commutation time, and 30 days lost recreation time.

Doe was also charged with *.306, conduct which disrupts, stemming from the Code 33 that was called after the incident, which caused the yard movements to be delayed over one hour. Doe was also found guilty on the *.306 charge and sanctioned to 180 days of administrative segregation, 180 days loss of commutation, and 30 days lost recreation time.

Doe appealed the hearing officer's decision arguing "violation of [s]tandards," "misinterpretation of the facts," and "other," requesting the sanction be suspended pending appeal. She submitted an addendum, arguing the proceeding violated her rights under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -49, for gender identity and

11

expression, as well as the Eighth Amendment protection against cruel and unusual punishment. Doe wrote a mitigation statement, dated June 13, 2019, which was not included in the agency record and is not addressed in the adjudication reports. Doe asked for leniency, as she is transgender, and has successfully and passably lived as a woman for over fifteen years, during which time she took female hormones. Doe asserts she was diagnosed with GID or gender dysphoria, which was recorded in her electronic medical records, her driver's license states her sex is female, and that, as a transgender person, both science and recent statistics have proven that trans persons are much more vulnerable to the negative and harmful effects of administrative segregation than the general prison population. Her appeal was denied.

On July 25, 2019, Doe both filed this appeal and sought a stay of the final agency decision from NJDOC. NJDOC denied her stay. On July 29, she sought permission to file an emergent application, which was granted.

On July 31, 2019, Doe filed a formal motion for a stay and for an expedited briefing schedule on the motion, which we granted because the Isolated Confinement Restriction Act, N.J.S.A. 30: 4-82.10, which was passed on June 20 and signed into law on July 11, 2019, to develop policies and implement procedures for inmates placed in solitary confinement, identified

vulnerable populations, that included Doe. We granted emergent relief given the assertion Doe was transgender and fell under the new law, as Doe's experience with administrative confinement amounted to isolated confinement, and emergent relief was granted in light of the legislative intent expressed in the new law. We made no findings in respect thereto.[6]

Our review of final administrative agency decisions is limited. Malacow v. N.J. Dep't of Corr., 457 N.J. Super. 87, 93 (App. Div. 2018). An administrative agency's decision will not be reversed unless it is "arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980) (citation omitted). "'Substantial evidence' means 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 192 (App. Div. 2010) (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)).

---

[6] Doe also filed a civil complaint against NJDOC and various others alleging violations of the NJLAD and the State Constitution protections of equal protection, due process, free expression, and prohibition on cruel and unusual punishment for housing her in a men's prison, for referring to her as male, for verbally and sexually harassing her, for failing to protect her from violence and causing her physical assault, and for prolonged solitary confinement.

Doe argues her adjudication was erroneous because the hearing officer did not credit her account of the incident for specific, justified reasons, and that ignoring her statement without findings of credibility or other justifications is unreasonable and does not constitute substantial evidence as required by N.J.A.C. 10A:4-9.15(a), Avant v. Clifford, 67 N.J. 496, 530 (1975), In re Public Service Electric & Gas Co., 35 N.J. at 376, and McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 562 (App. Div. 2002).

Disciplinary actions may only be taken "where the inmate's involvement is supported by substantial evidence." Avant, 67 N.J. at 530; N.J.A.C. 10A:4-9.15(a). However, we do not substitute independent judgment for that of an agency "where there is a mere difference of opinion concerning the evidential persuasiveness of relevant testimony." In re Pub. Serv. Electric & Gas Co., 35 N.J. at 376.

Substantial evidence is found where there is a "reasonable basis for the agency's action." McGowan, 347 N.J. Super. at 562. "Where there is substantial evidence in the record to support more than one regulatory conclusion, 'it is the agency's choice which governs.'" In re Vineland Chem. Co., 243 N.J. Super. 285, 307 (App. Div. 1990) (quoting DeVitis v. N.J. Racing Comm'n, 202 N.J. Super. 484, 491 (App. Div. 1985)).

14

Here, the hearing officer considered what were consistent statements by Rodriguez, Roberts, and Lantigua, as well as the confrontation questions and answers and incident reports. She also considered the medical reports, which showed Roberts sustained swelling and redness on his left cheek, which corroborated the statements by all three staff that Doe swung her fist at him. Although Roberts' injury could have resulted from Doe attempting to defend or shield herself, Doe herself reported that she lay in a fetal position and did nothing but plead with them to stop the entire time; she does not indicate she attempted to shield herself or move in any way that offers an alternative explanation for Roberts' swelling and redness to his jaw. Therefore, even with the clear imbalance of power between Doe and the officers and lack of video or photographic evidence, the evidence provides a rational basis for the hearing officer's finding that Doe's statement did not exonerate her. We are required to defer to the credibility determination of the hearing officer.[7]

---

[7] We also reject Doe's argument she was entitled to a polygraph examination. Under N.J.A.C. 10A:3-7.1, use of a polygraph examination is discretionary. The Administrator or designee "may" request a polygraph where there are credibility issues regarding serious incidents that may result in a disciplinary charge or where it may assist an investigation when appropriate, under N.J.A.C. 10A:3-7.1(a)(1) and (b), but "[a]n inmate's request for a polygraph examination shall not be sufficient cause for granting the request," under N.J.A.C. 10A:3-7.1(c).

Further, there was no expertise or special knowledge required here to make a finding of guilt as to whether Doe struck Roberts, or whether she was attacked; it was a matter of examining the statements of all involved, the reports, and determining which of the differing accounts was credible.

Doe asserts that the facts leading up to the use of force—that she asserted her female gender, objected to being treated inconsistently with her gender identity, and that the officers continued to refer to her as a man, which were all violations of NJLAD—are not in dispute and it was "arbitrary, capricious or unreasonable" that the hearing officer and appeal adjudicator failed to consider them.

NJDOC has adopted PREA, which prohibits "cross-gender pat-down searches of female inmates, absent exigent circumstances" and requires the facility to "document all cross-gender pat-down searches of female inmates" under 28 C.F.R. § 115.15(b) and (c), and must be done in a respectful and least intrusive manner possible, consistent with security needs, under 28 C.F.R. § 115.15(f).

Notwithstanding the fondling allegation, Doe asserted her female gender for over a year and was still subject to pat-down search by male officers with no evidence of exigency, which violated PREA. She contends the NJDOC

gave no consideration or acknowledgment of this unlawful conduct, which was unreasonable and renders the agency decision arbitrary and capricious. We disagree, not because we want to overlook an obvious wrong, but because the narrowness of our inquiry requires it.

Doe's transgender status has no direct bearing on the adjudication of guilt because an inmate is not permitted, under any circumstances, to assault a corrections officer. If an inmate believes that a corrections officer or the NJDOC has violated his or her legal rights, the inmate can pursue numerous legal avenues to vindicate those rights, including filing an internal grievance and filing a lawsuit, both of which Doe has done.

A hearing officer may disallow confrontation questions "that may . . . be irrelevant." N.J.A.C. 10A:4-9.14(d). Under N.J.A.C. 10A:4-4.1, *.002, "assaulting any person," is in the category of the most serious infractions, which result in the most severe sanctions. N.J.A.C. 10A:4-4.1(a)(1)(ii). It provides that a finding of guilt "shall result in a sanction of no less than 181 days and no more than 365 days of administrative segregation per incident and one or more of the sanctions listed at N.J.A.C. 10A:4-5.1(e), unless a medical or mental health professional determines that the inmate is not appropriate for administrative segregation placement." N.J.A.C. 10A:4-4.1(a)(1).

The code does not recognize a provocation defense or any other defense. Therefore, although Doe may have felt provoked, and while PREA, which the NJDOC has adopted, requires a female to pat-down a transgender inmate unless there are exigent circumstances,[8] provocation does not negate a finding of guilt as to striking Roberts. We cannot conclude the hearing officer acted in an arbitrary, capricious, or unreasonable manner when she did not permit the confrontation questions pertaining to Doe's transgender identity as irrelevant.

Doe argues the hearing officer should have considered her account of the incident and the "setting and circumstances of the prohibited behavior" in imposing sanctions under N.J.A.C. 10A:4-9.17(a)(2), her mitigation. Under N.J.A.C. 10A:4-9.17(a)(1) – (5), a

> disciplinary action <u>may</u> be individualized by considering such factors as the: (1) [o]ffender's past history of correctional facility adjustment; (2) [s]etting and circumstances of the prohibited behavior; (3) [i]nvolved inmate's account; (4) [c]orrectional goals

---

[8] The NJDOC website indicates it "maintains compliance with the Prison Rape Elimination Act (PREA)." https://www.state.nj.us/corrections/pages/PREA.html. 28 C.F.R. § 115.5(b) does not permit cross-gender pat-down searches of female inmates unless there are exigent circumstances. The National PREA resource center states that there are four options for searches of transgender inmates: (1) those conducted by medical staff; (2) pat searches of adult inmates conducted by female staff only; (3) asking inmates to identify the gender they would feel most comfortable conducting a search; and (4) searches conducted in accordance with the inmate's gender identity. https://www.prearesourcecenter.org/node/3257.

set for the inmate; and (5) [t]he inmate's history of, or the presence of, mental illness.

[(Emphasis added).]

Consideration of these factors is discretionary. The record reflects the hearing officer did consider Doe's statement but did not find that it exonerated Doe, and there is no indication the hearing officer received any mitigation statement, as it is neither listed among the evidence considered, nor part of the record.

We do not agree with Doe that her defense statement and mitigation required a reinvestigation on agency appeal because of claims of transgender identity and the inappropriate search, and NJDOC's failure to investigate the issues related to the officers' unlawful conduct constituted arbitrary and capricious agency action. The record reflects Doe's defense statement was considered, but found to be non-exonerating; the claims as to Doe's transgender identity were not directly relevant to her defense of assault; and other than notifying Doe of the charge, collecting the statements and attaching the evidence to the record, the other investigative duties enumerated in the code are discretionary. Further, an investigator did attempt to obtain Doe's statement, which she did not want to give without counsel present. Therefore, NJDOC was not required to reinvestigate if it found there were sufficient facts

19

to form a basic understanding of the incident, which would make it unnecessary, and does not constitute arbitrary and capricious agency action.

Finally, Doe argues the sanction of 270 days administrative segregation, 270 days loss of commutation time, and 30 days of loss of recreation privileges is disproportionate to the offense, even if the guilty finding were accepted. She asserts the adjudicator is required to consider the proportionality of the sanction and contends the hearing officer's explanation of the sanctions was insufficient under Mejia v. New Jersey Department of Corrections, 446 N.J. Super. 369, 378-79 (App. Div. 2016).

Here, the hearing officer cited the need for deterrence and Doe's refusal to be accountable and take responsibility. Doe argues the description did not say how the sanctions were individualized to these particular facts as required under N.J.A.C. 10A:4-9.17(a). We agree the sanction warrants reconsideration.

As to considering the factors enumerated in N.J.A.C. 10A4:9.17(a), as noted in Mejia, the regulations, "unfortunately, leave the use of those or other 'such factors' entirely to the discretion of the hearing officer." 446 N.J. Super. at 378. Because of this extremely broad discretion, a hearing officer is required to articulate sanctioning factors so that an appellate court may review

whether a sanction "is imposed for permissible reasons and is located at an appropriate point within the allowable range."  446 N.J. Super. at 379.

Here, the sanction was 271 days of administrative segregation, which is around the mid-point of the minimum 181 days and the maximum 365 days for a *.002 guilty adjudication under N.J.A.C. 10A:4-4.1(a)(1)(ii).  The hearing officer's reasons for the sentence were minimal; "[Doe] already referred for PREA.  No [mental health] to note, prior assaultive disciplinary [illegible] noted, (staff assault), to deter staff assaults; [Doe] refuses to be accountable [or] take responsibility for actions."  Notwithstanding the lack of a mitigation statement, the hearing officer gave less than appropriately individualized consideration of Doe's obvious circumstances as required under Mejia.

On June 20, 2019, the Isolated Confinement Restriction Act, N.J.S.A. 30:4-82.5 to -82.11, passed both houses of the legislature and was approved on July 11, 2019, to take effect on August 1, 2020.  L.2019, c. 160, § 6, eff. Aug. 1, 2020.  Under N.J.S.A. 30:4-82.6(a), the Legislature found and declared that isolated confinement "should be restricted to ensure the safe and humane operation of these facilities, consistent with the New Jersey Constitution, the laws and public policies of this State, the mission of the correctional system, evolving medical knowledge, and human rights standards of decency."

The rule came out of reforms adopted nationally to reduce the use of isolated confinement, which "[c]it[ed] the devastating and lasting psychological consequences of solitary confinement." N.J.S.A. 30:4-82.6(d). N.J.S.A. 30:4-82.6(b) states that isolated confinement "should not be used against vulnerable populations," and N.J.S.A. 30:4-82.7(h) defines a "[m]ember of a vulnerable population" to include any inmate who "is perceived to be lesbian, gay, bisexual, transgender, or intersex."

N.J.S.A. 30:4-82.10 states that "[n]ot less than 90 days" before the effective date, the commissioner shall develop policies and implement procedures for the review of inmates placed in isolated confinement, initiate a review of those inmates, and develop a plan for step-down and transitional units, programs, and staffing patterns to accommodate inmates currently placed in isolated confinement, inmates who will be placed in isolated confinement, and inmates who receive an intermediate sanction in lieu of being placed in isolated confinement.

While Doe, as a transgender person, is a member of a vulnerable population, the effective date is not until August 1, 2020, and the Legislature has given the agency until then to put in policies and procedures, after which there is an additional transitional period for it to take effect.

A-5101-18T1

However, given the Legislature's findings that isolated confinement "should not be used against vulnerable populations," which includes transgender persons, and the "devastating and lasting psychological consequences of solitary confinement" referenced in the statute, it is not in the spirit of Avant to send Doe to administrative segregation to serve out the remaining approximately seven months—some of which would occur before the effective date of the Act, with additional time to transition to an alternate sanction.

As Avant states, "[s]ociety has a stake in whatever may be the chance of restoring [an inmate] to normal and useful life within the law . . . society has a further interest in treating the [inmate] with basic fairness: fair treatment will enhance the chance of rehabilitation . . . ." Avant, 67 N.J. at 523.

Doe was housed in a men's prison, despite having changed her name to a traditionally feminine one and repeatedly asserting she was a transgender woman, and was subjected to a pat-down by a male officer, where she was entitled under the law to have a female officer pat-down absent exigent circumstances (which were likely not present as she was called to the office in advance). While this treatment was not directly relevant to her guilty adjudication for striking an officer, it is relevant to her sanction. While some

23

of the unfairness to which Doe was subjected has been remedied, as she is now in a women's prison, it is not apparent whether or how Doe should complete her sanction. Given that uncertainty, we remand to the NJDOC to reconsider the sanction in light of the change in the law, the changed circumstances of her confinement and an acknowledgement of her vulnerabilities.

We have carefully reviewed the record regarding all remaining arguments and determined they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Accordingly, we affirm the guilty adjudication, stay the sanction until the Isolated Confinement Restriction Act takes effect on August 1, 2020, at which time Doe's sanction should be reviewed in accordance with N.J.S.A. 30:4-82.10.

Remanded for reconsideration of the sanction. We retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5101-18T1