**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3666-15
                A-3752-15

IN THE MATTER OF THE
PETITION OF NEW JERSEY
NATURAL GAS COMPANY FOR
A DETERMINATION
CONCERNING THE SOUTHERN
RELIABILITY LINK PURSUANT
TO N.J.S.A. 40:55D-19 AND
N.J.S.A. 48:9-25.4.

_____

Argued January 20, 2021 – Decided April 29, 2021

Before Judges Yannotti, Haas and Natali.

On appeal from the New Jersey Board of Public Utilities, No. GO15040403.

Paul Leodori argued the cause for appellant Pinelands Preservation Alliance (Paul Leodori, PC, attorney; Todd M. Parisi, on the brief).

Daniel A. Greenhouse argued the cause for appellant Sierra Club (Eastern Environmental Law Center, attorneys; Aaron Kleinbaum, of counsel; Raghu Murthy, on the briefs).

Geoffrey R. Gersten, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public

Utilities (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Andrew M. Kuntz, Deputy Attorney General, and Geoffrey R. Gersten, on the briefs).

James C. Meyer argued the cause for respondent New Jersey Natural Gas Company (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Kevin H. Marino and John A. Boyle, on the briefs).

Maura A. Caroselli, Assistant Deputy Rate Counsel, argued the cause for respondent New Jersey Division of Rate Counsel (Stephanie A. Brand, Director, attorney; Maura A. Caroselli, on the briefs).

PER CURIAM

These two appeals, argued back-to-back and consolidated for purposes of this opinion, arise from a proposal by respondent New Jersey Natural Gas Company (NJNG) to construct a natural gas pipeline through several municipalities and a portion of the Pinelands Area. On March 18, 2016, the Board of Public Utilities (Board) granted a petition by NJNG pursuant to N.J.S.A. 40:55D-19, and determined that the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, and any local governmental development regulations adopted pursuant to the MLUL, would not apply to the construction of the pipeline.[1]

---

[1] We will refer to this petition as the MLUL petition.

Appellants Pinelands Preservation Alliance (PPA) and Sierra Club (SC) appeal from the Board's decision. Having reviewed appellants' contentions in light of the record and applicable law, we affirm.

I.

The procedural history and facts of this matter are fully set forth in the Board's thorough written opinion and, therefore, we need only summarize the most salient facts here. NJNG is a New Jersey public utility engaged in the business of purchasing, distributing, transporting, and selling natural gas to approximately 510,000 customers in Morris, Middlesex, Monmouth, and Ocean Counties, and the most southeastern portion of Burlington County. While NJNG's northern service area was connected to five interstate transmission feeds, three of which could independently supply that entire region, NJNG's central and southern service areas were connected to the Texas Eastern Transmission (TETCO) gas pipeline, a single interstate feed located outside of NJNG's franchise area in Middlesex County.

On April 2, 2015, NJNG filed the MLUL petition[2] with the Board proposing the construction and operation of an interstate natural gas

_____

[2] In addition to the MLUL petition, NJNG filed a "safety petition" seeking, among other things, the Board's approval to install the pipeline "within 100 feet

transmission pipeline to be known as the Southern Reliability Link (SRL). As explained in its MLUL petition, NJNG designed the SRL "to maintain system integrity and reliability by creating a new, redundant major feed of natural gas supplies from a second interstate transmission system." The SRL would connect NJNG's existing natural gas system to a new interstate supply point located in Chesterfield and operated by the Transcontinental Pipe Line Company (Transco). The SRL would run from that supply point through six townships: Chesterfield, North Hanover, Upper Freehold, Plumsted, Jackson, and Manchester. A 12.1 mile portion in Ocean County, which included right-of-way (ROW) areas located within and alongside the Joint Base McGuire-Dix-Lakehurst (Joint Base), would cross the State-designated Pinelands Preservation Area, N.J.S.A. 13:18A-2, -9, and -11(b). NJNG filed an amended petition incorporating a new route through Upper Freehold Township on June 5, 2015.

In its MLUL petition, NJNG asked the Board to: (1) determine that the project was reasonably necessary for the service, convenience, and welfare of the public; (2) designate the pipeline's route through North Hanover and

---

of any building intended for human occupancy." The Board granted the safety petition. PPA filed a separate appeal challenging the Board's approval of the safety petition. Docket No. A-2876-15. In an opinion filed on this date in that appeal, we affirm the Board's decision granting the safety petition.

A-3666-15

Chesterfield; and (3) determine that all of the zoning and local land ordinances and regulations promulgated under the MLUL by Burlington, Monmouth and Ocean Counties, and Chesterfield, North Hanover, Upper Freehold, Plumsted, Jackson, and Manchester Townships would not apply to the project. The Board retained the MLUL petition for hearing and designated Commissioner Dianne Solomon to conduct the case.

Commissioner Solomon denied PPA's motion to intervene in the hearing, but granted its motion to participate in the proceeding, "limited to the right to argue orally and file a statement or brief as set out in N.J.A.C. 1:1-16.6(c)(1) and (2)." SC did not seek to intervene or participate in the matter. However, Commissioner Solomon conducted three public hearings on the petition and both PPA and SC presented testimony opposing the SRL project at the public hearing held on July 28, 2015.

Commissioner Solomon conducted an evidentiary hearing on December 5, 2015. NJNG and the affected local municipalities presented pre-filed and live testimony. Craig A. Lynch, NJNG's Senior Vice President of Energy Delivery, testified that he had thirty years of experience designing and operating NJNG's system. Lynch stated that the SRL project was needed to support the reliability and integrity of NJNG's intrastate transmission system by providing a redundant

A-3666-15

major transmission feed to its Central and Ocean Divisions, which serve its customers in Ocean, Burlington, and Monmouth Counties.

Lynch explained that over 85% of NJNG's winter peak-day gas supply for its Central and Ocean Divisions was provided by a single interstate connection operated by TETCO. The remaining 15% of NJNG's winter peak-day gas supply was provided by two smaller connections. Thus, unlike NJNG's Northern Division with its five major interstate feeds, NJNG's customers in its Central and Ocean Divisions were most vulnerable to a TETCO supply chain failure. The SRL project would provide "a major supply of natural gas from a second interstate supply (Transco), reducing dependency on a single primary source (TETCO)." According to Lynch, "[t]he aspirational goal of NJNG [was] to be able to maintain service to the entire Monmouth/Ocean/Burlington region should one of these sources of supply be interrupted, or experience a prolonged loss of use of existing NJNG transmission facility along its internal backbone system."

Lynch explained that Superstorm Sandy had revealed NJNG's critical need for system redundancy in its Central and Ocean Divisions, especially after 31,000 of its customers had gas service curtailed during and after the storm. Lynch stated that these service curtailments were related to NJNG's decision to

6

depressurize the local transmission system for safety reasons, and not to a total interruption of the interstate supply. Nevertheless, this storm event demonstrated to NJNG the tremendous cost of a potential widespread intrastate curtailment, together with "other implications like making customer homes inhabitable due to a lack of heat and hot water." Lynch stated that "each location damaged [by the storm] also had substantial areas downstream that were viable," so "[i]f additional feeds were available to those systems, the outages could have been minimized because [NJNG] would have isolated the damaged areas and kept gas flowing to the undamaged areas."

Lynch then identified the significant difficulties, costs, and delays that would arise in connection with restoring service after a widespread interruption in the absence of a redundant feed:

> [T]he pipeline would need to be brought back into service either by repair or replacement. Once the pipeline was restored, each affected distribution system would need to be restored, and each customer's service would need to be individually restored. After the curtailment, technicians would have to visit every customer, door to door, multiple times (to turn off, reenergize, and turn on appliances) to restore service. For example, after Superstorm Sandy, it took two months to restore service to approximately 31,000 customers on Long Beach Island and the Seaside Peninsula area of NJNG's service territory. Restoring service to a larger population of customers could take much longer.

A-3666-15

Lynch also described two events involving TETCO's interstate feed during which the SRL would have affected NJNG's transmission and distribution system and demonstrated the need for the SRL. First, TETCO's Entriken/Chambersburg compressor stations had reduced the capacity of gas flowing to NJNG due to a system failure that lasted from January 7 to January 15, 2015. "TETCO declared the outages a <u>force majeure</u> event," and NJNG estimated that a similar outage would affect approximately 350,000 to 400,000 of its customers, cost between $170 million to $190 million, and take a minimum of four months to restore service once adequate supply became available.

Second, during the 2014 Polar Vortex, an unplanned outage at TETCO's Delmont compressor station decreased the availability of natural gas to NJNG. This resulted in decreased line pressure and required NJNG to run its liquified natural gas (LNG) plants for thirty-six hours to maintain system integrity and replace lost supply. Lynch stated that a lengthier or more intense TETCO outage "could have resulted in significant customer interruptions because LNG supply and send[-]out capacities are limited." He explained that LNG plants cannot replace a lost supply of more than 160,000 dekatherms[3] per day (Dth/day).

---

[3] A "dekatherm" is a unit of energy used primarily to measure natural gas.

Lynch asserted that with the SRL in place, there would have been no risk to customer interruptions during either of these events since gas service would have been provided via the SRL's connection to Transco. Because NJNG currently relied on a single interstate feed for nearly all of its gas supply to its Central and Ocean Divisions, Lynch testified it would be "bad planning and irresponsible" for NJNG to wait for a catastrophic event resulting in widespread service loss before taking steps to avoid or mitigate such an event.

Lynch also testified that the New Jersey Reinvestment in System Enhancement (NJ RISE) Program, approved by the Board in 2014, would not render the SRL unnecessary. NJ RISE was "the name of a group of six NJNG projects approved by the [Board] in 2014 providing system enhancements that improve NJNG's distribution system through storm hardening investments." Lynch explained that because four of those projects served as secondary feeds to large single-feed distribution systems along the coast, the NJ RISE project would not render the SRL unnecessary.

Lynch testified that the SRL project was intended exclusively for reliability and not expansion or addition of services. "[T]he planning and design of this [p]roject [was] exclusively a reliability project, providing an alternate source of natural gas for our customers." However, he agreed that expansion or

9

addition of services was "not out of the question," and that more customers would increase NJNG's profits.

Respondent Division of Rate Counsel presented the testimony of Edward A. McGee of McGee Consulting, LLC. McGee believed that only a portion of the cost of the proposed line should be borne by ratepayers, since the proposed pipeline was oversized for the current contract that NJNG had negotiated with the interstate pipeline transporting gas to the SRL. He explained that since the entire amount of gas set forth in the contract could be supplied to NJNG's system through a smaller-diameter line, only the cost of a smaller-diameter line should be borne by ratepayers. However, McGee made clear that he did not mean to suggest that NJNG should install a twenty-four-inch pipeline instead of its planned thirty-inch pipeline. Instead, he explained that while NJNG could choose the size of the line, ratepayers should not be expected to pay the cost of an oversized line.

In response, Lynch testified it would be a mistake to equate the diameter of the pipeline with the contract NJNG had signed for the gas supply, and to conclude this volume was best delivered only with a twenty-four-inch pipe. According to Lynch, contract volume did not equal reliability requirements. That is, contract volume was limited by the infrastructure of the interstate

A-3666-15

pipelines and did not reflect NJNG's full reliability requirement. Lynch explained that "NJNG's primary existing backbone is [thirty]-inch pipeline" and a similarly-sized pipeline for the SRL project was "required to feed the entire system once upgrades are made to [the] backbone to provide for a fully looped system."

Lynch stated that without a "looped backbone," the SRL could not provide gas to the entire southern portion of NJNG's service area. In the event there was a reduction of supply from TETCO, the SRL's design would ensure transmission system integrity. Also, in the absence of a thirty-inch pipeline, the additional capacity transacted for in the event of an interruption could not flow properly without an unacceptable pressure drop.

NJNG also presented the testimony of Barry A. Baker, manager of the Impact Assessment and Permitting Department at AECOM Technology Corp., who testified as an expert on siting utility transmission facilities. NJNG retained AECOM and Baker to assist in the evaluation and development of an alternate routes study in order to select a route for the SRL that would best minimize impacts to local communities and the natural environment while maintaining constructability.

11

Baker's alternatives analysis consisted of four fundamental phases: define the project study area, generate alternative routes, evaluate the alternatives, and determine the selected route using a quantitative and qualitative assessment. In the first phase, Baker found that a new service feed was required to accomplish NJNG's project objectives of developing an independent gate station capable of delivering large volumes of gas, supporting the southern end of NJNG's transmission system, and not needing supply from TETCO.

Baker next split the proposed pipeline into two geographical sections because the eastern portion of the study area was located within the Pinelands and any route through that area would need to combine the impacts to the built and natural environments while maintaining a feasible engineering design. Section One began in Chesterfield at the Transco compressor station connector point and extended easterly to the Pinelands Area boundary. Section Two bordered the western edge of the Pinelands Area and extended eastward to NJNG's existing facilities in Manchester Township.

Baker then employed a detailed siting analysis to determine the different alternative routes that would best balance social, environmental, engineering, and economic considerations. He also considered siting the SRL within or parallel to existing pipeline and utility ROWs, and crossing undeveloped land.

12

Baker identified five alternative routes for Section One, and four alternatives for Section Two. Baker explained the methodology used to generate each of the alternative routes:

> The goal of the [a]lternatives [a]nalysis was to identify a route that minimizes the impact to the built and natural environments to the maximum extent practicable, while still maintaining the technical and economic viability of the [p]roject. The [a]lternatives [a]nalysis was used to determine the most suitable route for a 30-inch underground transmission main connecting the Transco compressor station in Chesterfield Township and transmission system in Manchester Township.

Baker's alternatives analysis considered potential impacts of each alternative route from three perspectives: (1) protection of the built environment, which addressed human and cultural resources, including residential neighborhoods, other community-valued buildings, and historic sites; (2) protection of the natural environment, which addressed plants, animals, aquatic resources, ecological resources, and natural habitat; and (3) engineering considerations, which addressed maximizing co-location and minimizing cost and schedule challenges for the SRL by seeking the shortest path or using existing ROWs, while also avoiding areas that posed significant construction obstacles.

13

Baker then evaluated the alternative routes based on quantitative and qualitative assessments, and determined the advantages and disadvantages of each. Following this analysis, Baker stated that various alternative routes were not selected because of "their relative lengths through sections of the Pinelands Management areas where such development [was] not considered a permissible use." He explained that two of these routes were too close in proximity to the highest number of schools and churches.

Two other proposed alternative routes, one that followed the Jersey Central Power and Light ROW (JCP&L ROW) and one that entered and crossed through the Joint Base were also not feasible. The JCP&L ROW route passed through preserved farmland parcels where pipeline development was prohibited, and that route had cumulative environmental impacts higher than any other alternative. The route that entered and crossed through the operational areas and firing ranges on the Joint Base was not selected because it would present various undesirable impacts, such as the dangers inherent in crossing a military range and possibly encountering unexploded ordnance.

Ultimately, Baker and AECOM selected Route B for Section One, and Route D for Section Two. Section One, Route B was approximately 16.7 miles, and would require the acquisition of approximately 1.1 miles of easements on

14

private property and would run underneath approximately 15.6 miles of roads. Section Two, Route D was approximately 11.7 miles, and would require the acquisition of 1.0 mile of private easements outside of the Joint Base, and the following easements within the Joint Base:  3.8 miles along the fence line of a side road; 3.8 miles under other Joint Base roads; 1.5 miles adjacent to an unused runway; and 1.4 miles along the side of other roads or undeveloped areas.[4] Baker concluded that these two routes would result in the least combined impacts to the built environment and natural environment while still offering a feasible engineering design and practicable construction.

John B. Wyckoff, P.E., NJNG's Director of Engineering, testified that the SRL pipeline would consist of approximately twenty-eight miles of a new thirty-inch diameter, one-half inch wall thickness, transmission line.  Each construction site would be approximately one-quarter mile long, and horizontal directional drilling would be used to pass under most creeks or streams.  Traffic control, road closings, detour routes, and the need for night work would be coordinated with local officials.

---

[4]  Baker also cited to a letter from the Joint Base Commander to Assemblyman Ronald Dancer on November 6, 2015, which stated that Route D had been "developed in close coordination with Air Force engineering, environmental, and legal experts and remains the best available on-base route."

Wyckoff further stated that the SRL was expected to provide 180,000 Dth/day, or more than 25% of NJNG's winter design day capacity. In NJNG's responses to discovery requests, it explained that on its "Peak Day" in winter of February 2015, "a volume of 180,000 Dth would represent approximately 33% of [NJNG's] pipeline supply into Monmouth/Ocean county service territory, and 32% of total customer demand including LNG production," while during the Polar Vortex, "a volume of 180,000 Dth would represent approximately 43% of [NJNG's] pipeline supply into Monmouth/Ocean county service territory, and 31% of total customer demand including LNG production."

Based upon the evidence presented at the hearing and at the three public hearings, the Board rendered a unanimous written decision and order approving NJNG's MLUL petition. As to the public's need for the SRL project, the Board concluded that NJNG "ha[d] met its burden of proof, and ha[d] shown that the Project 'is reasonably necessary for the service, convenience or welfare of the public' pursuant to N.J.S.A. 40:55D-19." Reviewing that evidence, the Board explained that NJNG's current transmission system unnecessarily left customers in its southern territory vulnerable, since those customers in parts of Ocean, Burlington, and Monmouth Counties were most defenseless to an interruption of supply from TETCO.

The Board found:

> In the event of a disruption in TETCO['s] supply, it is
> evident that NJNG's existing two remaining
> interconnections with Transco, which are also at the
> northern end of NJNG's transmission system servicing
> the Counties, lack the ability to maintain adequate
> pressure at the southern end of the system. These two
> Transco interconnections have an approximate capacity
> of 76,500 and 124,500 Dth/day and are [sic] their
> expansion is limited by the existing Transco
> transportation capacity available. NJNG's LNG
> facilities can also be utilized to help maintain system
> pressures. However, the LNG facilities have a
> maximum send-out of 170,000 Dth/day. At maximum
> send-out with a full tank, current LNG supplies will last
> approximately seven (7) to ten (10) days.
>
> Any supply disruption that outstrips the capacity of the
> existing Transco interconnection and LNG's ability to
> maintain adequate system pressure will result in the
> loss of service to customers in the southern portion of
> the [c]ompany's service territory. Should this happen,
> NJNG would need to isolate portions of the distribution
> system by shutting line valves and go house-to-house
> in the isolated areas to shut valves at each meter. The
> extent of the areas isolated depends on the extent of the
> supply interruption. Once supply issues are resolved,
> the isolated sections would need to be reenergized and
> each individual customer would need to be turned back
> on and their appliances re-lit.

Thus, the Board concluded that NJNG's current interconnection with TETCO's

Texas Eastern Transmission Pipeline, which was located at the northern end of

NJNG's transmission system servicing the counties, equated to "a single point

17

of failure," and that the SRL's design and the fact that it would provide an alternate interstate supply source to the southern portion of NJNG's transmission system would mitigate the potential impact of this failure point.

The Board further found that NJNG had considered alternatives to its SRL project, but had correctly rejected them because they did not meet the three criteria required for NJNG to reinforce its current transmission system: (1) "there must be an independent gate station capable of delivering large volumes of gas"; (2) this gate station "must support the southern end of NJNG's transmission system"; and (3) "it must not provide supply from TETCO."

The Board also rejected McGee's testimony on behalf of the Rate Counsel that the full capacity of a thirty-inch pipeline was not necessary for redundancy purposes. Relying on Lynch's testimony, the Board agreed that the 180,000 Dth/day contract was not an appropriate tool to determine the correct size of the pipe for the project.

The Board further concluded that the SRL project would serve the goals of the State's 2011 Energy Master Plan (EMP) because the pipeline would "add a significant, diverse source of natural gas, while also increasing overall system reliability and reinforcement in NJNG's service area." The Board explained:

> The EMP was released in 2011 and sets forth the strategic vision for the use, management and

A-3666-15

development of energy in New Jersey, with the overarching goal of saving money while stimulating the economy and protecting the environment. One of the five (5) major goals of the EMP is to expand in-state electricity resources by promoting the "expansion of the existing [natural gas] pipeline network that serves gas utilities and power plants throughout New Jersey." An [u]pdate to the EMP ("EMP Update") was released in 2015. The EMP Update recommended no changes to the goals stated in the 2011 EMP and further recommended the continued advocacy "for enhanced intrastate [pipeline] capacity at local levels." The actions, decisions, determinations and rulings of State government entities with respect to energy "shall to the maximum extent practicable and reasonable and feasible conform" with the provisions of the EMP. N.J.S.A. 52:27F-15(b). In implementing its regulatory powers and its responsibilities, the Board considers the directives of the EMP.

Thus, pursuant to N.J.S.A. 40:55D-19, the Board concluded that NJNG had "demonstrated the need to address its risk of a supply interruption to its gas transmission system." The Board explained that "the pipeline was selected to provide appropriate flows, in the case of curtailments in excess of 180,000 Dth/day," and that the "SRL will provide a significant, diverse feed to NJNG's transmission system and support the integrity of such, while minimizing the risk of an interstate supply interruption."

The Board next found that the evidence supported NJNG's review and analysis of the alternative intrastate routes for its project, and that its chosen

route for the SRL "[was] the most appropriate, primarily because NJNG and AECOM have demonstrated that its alignment minimizes the overall potential impacts to the environment and the community." The Board, therefore, concluded there was "no reasonable practicable alternative which would have less adverse impact upon the environment or upon the land use and zoning ordinances of the respective counties and municipalities."

The Board rejected the objectors' claims that there were more feasible alternatives for routing the SRL than NJNG's preferred route, such as routes that traversed through the Joint Base or followed the JCP&L ROW. With respect to the Joint Base, the Board found the evidence supported NJNG's assertion that this alternative "would present undesirable operational impacts" since crossing a military range complex and other operational areas would result in the possibility of encountering unexploded ordnance. The Board also noted that the Base Commander concurred that NJNG's proposed route was "developed in close coordination with Air Force engineering, environmental, and legal experts and remains the best available on-base route."

Rejecting the JCP&L ROW route, the Board found the evidence supported NJNG's assertion that this alternative would require the pipeline to cross preserved farmland, which was prohibited by the New Jersey Farmland

20

Preservation Program, known as the Agriculture Retention and Development Act (ARDA). N.J.S.A. 4:1C-11 to -48, and the State Agricultural Development Committee (SADC) regulations, N.J.A.C. 2:76-1.1 to -27.10. The Board also explained that this alternate route posed great environmental risks:

> [T]he utilization of the JCP&L ROW would require extensive clearing and cross environmentally sensitive areas containing extensive wetlands as well as threatened and endangered species, resulting in a higher overall impact to the interests being balanced in the alternatives analysis. As reflected in the [a]lternatives [a]nalysis, AECOM found that Route D crossed the most streams, most wetlands, most floodplains and the most landscape-identified threatened and endangered ("T&E") species habitat areas. Route D was also assigned the highest special permit value (five (5)) because this alignment would cross the most streams, most wetlands, most floodplains and the most landscape-identified T&E species habitat areas.

Therefore, the Board concluded that the route involving the utilization of the JCP&L ROW not only had the greatest environmental concerns, but also required NJNG to cross preserved farmland in contravention of state law. Accordingly, the Board found that a proposed route other than the one NJNG selected was "not feasible."

The Board further found that the cost estimates reflected in the record for the SRL project ranged from approximately $150 million to $180 million. However, in determining whether the SRL project was "reasonably necessary

21

for the service, convenience or welfare of the public" under N.J.S.A. 40:55D-19, the Board also considered "the cost that New Jersey electricity customers [would] bear in connection with the Project."

Consequently, the Board examined NJNG's review of alternative project proposals, that is, ones that extended interstate pipelines from multiple interstate suppliers through New Jersey to NJNG's service territory. According to NJNG's review, construction of an interstate pipeline extension to its service territory would cost approximately $10 million per mile. Based on this cost and the estimated rates of return authorized by the Federal Energy Regulatory Commission, NJNG found, and the Board agreed, that it would be more costly to pursue an interstate pipeline extension. "Since the Project is thirty (30) miles long, the costs of an interstate pipeline would be approximately $300 million, compared with the current intrastate pipeline estimate of $150-180 million."

But the Board determined from the evidence that a number of other factors could influence and add to NJNG's proposed cost of an intrastate pipeline, such as overall length, road restoration, easement acquisition, site clearing, environmental mitigation, site access, and requirements to cross wetlands and streams. Thus, the Board found that, at the very least, the cost of a pipeline

22

alignment following the various alternative routes evaluated in NJNG's analysis could be considered comparable.

Nevertheless, the Board took a further step in its analysis based on the fact that the SRL was reasonably necessary since a single interstate supply from TETCO currently provided the majority of gas for NJNG's territory in question. That is, from the evidence presented, the Board reasoned:

> If the [c]ompany experiences a loss of this TETCO supply, this would ultimately result in interruptions to approximately 350,000 to 400,000 customers during peak send-out periods in winter. Restoration of service to these customers would take a minimum of four (4) months and result in direct expenses to the company ranging from approximately $170 to $190 million, not including losses related to the loss of social services or economic activity.

Thus, the Board found: (1) "the cost of building an intrastate pipeline, owned and operated by NJNG and supplied by Transco, [was] reasonable as compared to the alternative of building a pipeline owned and operated by an interstate supplier"; (2) there was "sufficient evidence in the record to conclude that the estimated cost of the line [was] reasonable to prevent the loss of service to NJNG customers and as compared to intrastate and interstate route alternatives"; and (3) the SRL project was "reasonably necessary for the service, convenience or welfare of the public" pursuant to N.J.S.A. 40:55D-19. Further,

23

because this matter was not a rate proceeding, the Board stated it did not have to "determine the recoverability of the cost of this Project, including the incremental cost difference between a twenty-four (24) and thirty (30) inch pipeline."

In sum, the Board determined in accordance with N.J.S.A. 40:55D-19 that: (1) the SRL project was "reasonably necessary for the service, convenience, or welfare of the public" to enable NJNG to continue to provide safe, adequate, and reliable service to its customers; (2) NJNG should be able to construct and begin operation of the pipeline as proposed; and (3) the local land use and zoning ordinances, and any other ordinance, rule or regulation promulgated under the auspices of the MLUL would not apply to the construction, installation, and operation of the project.

Accordingly, the Board ordered that "neither N.J.S.A. 40:55D-1 et seq., nor any other government ordinances or regulations, permits or license requirements made under the authority of N.J.S.A. 40:55D-1 et seq. shall apply to the siting, installation, construction, or operation of the [p]roject." The Board expressly made its order "subject to the approval of any pending road opening permits from the affected municipalities and the New Jersey Department of Transportation, all other pending permits and approvals, if any, and the pressure

testing requirements of N.J.A.C. 14:7-1.14 prior to placing the Pipeline in operation." (emphasis added).

These appeals followed.

II.

PPA argues that the SRL project violates the Pinelands Protection Act (Pinelands Act), N.J.S.A. 13:18A-1 to -29, the Pinelands Comprehensive Management Plan (CMP), and local municipal Pinelands ordinances. It also claims that the Pinelands Commission's (Commission's) Certificate of Filing (COF) did not constitute a proper review of the merits of the project through the Pinelands.

In addition, PPA asserts that the SRL project is not "associated with the function" of the Joint Base "as required by the CMP." PPA further asserts that the Board should have concluded that the project violated the remediation process of natural restoration previously approved by the United States Environmental Protection Agency (USEPA) and other environmental standards established by the New Jersey Department of Environmental Protection (NJDEP). These contentions all lack merit because none of these issues were before the Board in this MLUL petition matter and, therefore, could only be considered by the agencies having jurisdiction over them.

A-3666-15

"Generally speaking, the [Board]'s power to regulate utilities is broad." In re Centex Homes, LLC, 411 N.J. Super. 244, 254 (App. Div. 2009). The Legislature vested the Board with the "general supervision and regulation of and jurisdiction and control over, all public utilities . . . and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of [Title 48]." N.J.S.A. 48:2-13(a). N.J.S.A. 48:2-23 empowers the Board to ensure that regulated public utilities provide safe, adequate and proper service to the citizens of New Jersey. In re Public Service Electric & Gas Co. (PSE&G), 35 N.J. 358, 371 (1961). N.J.S.A. 48:2-19 states that the Board may "[i]nvestigate, upon its own initiative or upon complaint in writing any matter concerning any public utility." Those provisions must be construed liberally. Twp. of Deptford v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 424 (1969); PSE&G, 35 N.J. at 371.

The specific standard applied by the Board when considering a petition filed by a utility company is reflected in N.J.S.A. 40:55D-19, which states in part:

> This act [(the MLUL)] or any ordinance or regulation made under authority thereof, shall not apply to a development proposed by a public utility for installation in more than one municipality for the furnishing of service, if upon a petition of the public utility, the Board of Public Utilities shall after hearing,

26

of which any municipalities affected shall have notice, decide the proposed installation of the development in question <u>is reasonably necessary for the service, convenience or welfare of the public</u>.

Nothing in this act shall be construed to restrict the right of any interested party to obtain a review of the action of the municipal agency or of the Board of Public Utilities by any court of competent jurisdiction according to law.

[(emphasis added).]

N.J.S.A. 48:9-25.4 further permits the Board to designate "a practicable route" for a public utility transmitting natural gas service if the local municipality fails or refuses to make such a designation or designates an impracticable route. That statute provides:

Any gas company organized under the laws of this State in addition to but not in limitation of the powers conferred by the laws under which it was organized may construct, lay, maintain and use facilities, conductors, mains and pipes, with the appurtenances thereto, in, through and beyond any municipality or municipalities, for the purpose of transmitting through the same natural gas or any mixture of gas or gases of any other type or types for use in its business; provided, that in each case such corporation shall first have obtained a designation by the governing body or official having control thereof, of the public street, road, highway or place, which may be occupied by such corporation for such purpose. If any governing body or official having control of any public street, road, highway or place, after having received from such corporation a request to designate

such public street, road, highway or place, for occupancy by such corporation for such purpose, shall fail or refuse to make such designation or to designate a practicable route, the Board of Public Utility Commissioners, upon application by the corporation, and after hearing on notice to such governing body or official, shall make such designation.

[N.J.S.A. 48:9-25.4 (emphasis added).]

These two statutes do not invalidate the specific laws governing the Pinelands, wetlands, or Superfund sites. An agency cannot issue or deny a permit "absent satisfaction of the applicable statutory criteria." In re Authorization for Freshwater Wetlands Gen. Permits, 372 N.J. Super. 578, 596 n.8 (App. Div. 2004).

However, "[w]hile the [Board] was 'intended by the Legislature to have the widest range of regulatory power over public utilities,' that power has never been cast in environmental terms." Centex Homes, 411 N.J. Super. at 265-66 (citation omitted). The language of N.J.S.A. 48:2-23 does not give the Board power to decide a public utility's compliance with environmental or land use requirements, or give those issues "overriding consideration" in its decision to extend service. Id. at 264.

Thus, the Board had no statutory authority to review NJNG's proposed construction for compliance with the Pinelands Act, the CMP Rules, the

USEPA's or NJDEP's decisions or orders, or with any other environmental statutory scheme. Indeed, as we recently held in another case involving the approval of a natural gas pipeline, only the Commission has the expertise and exclusive legislative authority to decide whether a pipeline project complies with the Pinelands Act and CMP Rules in the coordinated permitting process. In re Petition of S. Jersey Gas Co. (SJG), 447 N.J. Super. 459, 482 (App. Div. 2016).

In SJG, this court addressed the Board's grant of a petition under N.J.S.A. 40:55D-19 for South Jersey Gas's proposed construction of a similar natural gas pipeline within the Pinelands. Id. at 471-72. We noted that a provision of the Pinelands Act, N.J.S.A. 13:18A-10(c), stated that "no State . . . permit . . . for the construction of any structure or the disturbance of any land within [the Pinelands] shall be granted unless such approval or grant conforms to the provisions of [the CMP]." Id. at 478. (alteration in original). However, we made clear that the decision as to whether the project conformed to the CMP had to be made by the full Commission and not by the Board. We stated:

> [I]n deciding whether to grant a petition brought under N.J.S.A. 40:55D-19, the Board determines whether the MLUL and local regulations adopted pursuant to the MLUL should be waived. The Board's approval of any MLUL petition must be consistent with the minimum

> standards of the CMP, but <u>the Board is not empowered</u>
> <u>to make that determination in the first instance.  In this</u>
> <u>matter, that decision must be made by the Commission,</u>
> <u>pursuant to its authority under the Pinelands Act and</u>
> <u>the CMP.</u>

[<u>Ibid.</u> (emphasis added).]

Therefore, we reject PPA's argument that the Board's decision was arbitrary or unreasonable because the Board did not make determinations on environmental issues that were within the jurisdiction of the Commission and other State and federal agencies.

PPA also argues that the COF prepared by the Commission's Executive Director was insufficient to demonstrate that the SRL project met the standards of the CMP.  In <u>SJG</u>, this court held that only the full Commission could make this determination and, because it did not, we remanded the matter to the Commission so that it could review the Executive Director's action.  <u>Id.</u> at 478-79.  PPA suggests that a similar remand is warranted here.  We disagree.

First, the Board specifically stated in its final decision that its approval of NJNG's petition was "subject to . . . all other pending permits and approvals." This language sufficiently accounts for the need for prior approval by the Commission.  Moreover, our Supreme Court has emphasized the importance of "comity and deference to sibling agencies" where the government oversees

"complex and manifold activities that are also the appropriate statutory concern of other governmental bodies." Hinfey v. Matawan Reg'l Bd. of Educ., 77 N.J. 514, 531 (1978). Thus, there is no merit to PPA's contention that the Board waived compliance with the Pinelands Act and the CMP Rules, or with the USEPA's orders or NJDEP's requirements by stating that its approval of the MLUL petition was subject to action by its sibling agencies on other pending permit applications.

Perhaps more importantly, the Commission adopted a resolution on September 14, 2017 approving NJNG's application to construct the pipeline in the Pinelands.[5] Therefore, NJNG has satisfied the requirements for Commission approval set forth in N.J.S.A. 13:18A-10(c) and no remand is necessary.

## III.

In a related issue, SC argues that the Board lacked the authority under N.J.S.A. 40:55D-19 to waive compliance with Pinelands protection ordinances adopted by municipalities allegedly under the authority of the Pinelands Act rather than the MLUL. Because we considered and rejected this identical

___

[5] PPA and SC have filed separate appeals challenging the Commission's approval of this application. Docket Nos. A-925-17 and A-1004-17. In an opinion also filed on this date, we affirm the Commission's approval of the application.

31

argument by SC in <u>SJG</u>, we discern no basis for reaching a different conclusion here.

In <u>SJG</u>, SC argued

> that the Board's decision waiving municipal approvals was wrong as a matter of law. [SC] contends that N.J.S.A. 40:55D-19 does not apply to Pinelands-based reviews and ordinances, and that the Board had no authority to override any local approval that is otherwise required by the Pinelands Act and any ordinances authorized and adopted under that Act.
>
> [447 N.J. Super. at 483.]

In explaining why we were "not persuaded by this argument[,]" we stated:

> By its plain language, N.J.S.A. 40:55D-19 gives the Board the authority to waive the MLUL and any local ordinance or regulation adopted pursuant to the MLUL. The Board's authority under N.J.S.A. 40:55D-19 necessarily includes the power to waive any MLUL review of approvals by municipalities in the Pinelands. The Pinelands Act does not limit the exercise of this power. However, as the Board recognized in its final decision, any development project for which local MLUL regulation is waived pursuant to N.J.S.A. 40:55D-19 remains subject to the Pinelands Act and the minimum standards of the CMP.
>
> [<u>Ibid.</u>]

Thus, the Board clearly had the authority to waive compliance with the MLUL and any local ordinance or regulation adopted pursuant to the MLUL

whether or not those ordinances were enacted by municipalities in the Pinelands Preservation Area.

SC contends that some of the municipal ordinances involved in this case were enacted pursuant to authority granted to the municipalities by the Pinelands Act rather than by the MLUL. However, SC does not identify any ordinances that meet this description. SC also argues that municipal ordinances adopted pursuant to the MLUL which impose standards that exceed those established under the Pinelands Act or the CMP should not be waivable under N.J.S.A. 40:55D-19. However, as we squarely held in SJG, "[t]he Board's authority under N.J.S.A. 40:55D-19 necessarily includes the power to waive any MLUL review of approvals by municipalities in the Pinelands." Ibid. (emphasis added). Therefore, we reject SC's contention on this point.

## IV.

As noted above, the Board granted PPA the opportunity to participate in the MLUL petition proceeding by filing a post-hearing brief and presenting oral argument. However, when PPA submitted its brief, it attached seventeen exhibits that had not been presented at either the evidentiary hearing or the public hearings. These exhibits included documents that had been filed with the Commission concerning the pipeline, several emails, the transcript of an October

33

2013 analyst meeting hosted by NJNG's parent, New Jersey Resources, a memorandum criticizing NJNG's proposal prepared by a consultant "in the mergers and acquisition arena with numerous clients within the energy industry," and various environmental studies and economic analyses of the Joint Base and of New Jersey Superfund Sites from 1999 to 2014. In presenting these exhibits, PPA failed to submit an affidavit or certification authenticating the documents or verifying the facts contained in them.

As a result, the Board declined to consider the seventeen exhibits as evidence. The Board explained that although N.J.A.C. 1:1-15.2 allows an agency to take official notice of its own documents and the existence of documents issued by a sister agency, the exhibits that PPA offered with its brief had no accompanying formal certifications and were never subject to a review process by the Board or by the other parties. Thus, the Board concluded that PPA was "attempting to import new evidence into the record, when the authoring witnesses ha[d] not been qualified to testify nor been subject to cross-examination." Nevertheless, the Board advised PPA that it would consider its new submissions as public comments rather than as evidence.

PPA now argues that the Board erred by failing to consider the documents as evidence. Again, we disagree.

PPA was not a party to the MLUL petition proceeding and, as a participant, it only had the right to file a brief and present oral argument. N.J.A.C. 1:1-16.6(c). Thus, PPA did not have the right to submit evidence during the evidentiary hearing or in a post-hearing brief.

Moreover, PPA improperly attached the exhibits to its brief without providing the required affidavit or certification authenticating the exhibits or attesting to the accuracy of the facts contained in the documents. As we stated almost thirty-five years ago,

> [t]he function of [a] brief is a written presentation of legal argument. Facts intended to be relied on which do not already appear of record and which are not judicially noticeable are required to be submitted to the [trier of fact] by way of affidavit or testimony. See R. 1:6-6 . . . . These are not merely formal requirements. They go to the heart of procedural due process.
>
> [Celino v. Gen. Accident Ins., 211 N.J. Super. 538, 544 (App. Div. 1986).]

As noted, the Board stated it would consider PPA's submissions as public comment along with all of the other non-evidentiary public comments it received from other participants. Under these circumstances, there is no basis for disturbing the Board's decision on this issue.

V.

In the remaining points of their briefs, PPA and SC argue that the Board's decision to grant NJNG's MLUL petition was arbitrary and capricious because the pipeline was not necessary to solve the "single point of failure" catastrophic scenario, which they assert could be better addressed with alternative routes that would avoid the Pinelands. They also allege that NJNG intends to use the SRL to maximize its profits rather than the reliability of its natural gas delivery system. These arguments lack merit.

Our scope of review of an administrative agency's decision is limited. In re Carter, 191 N.J. 474, 482 (2007). "An appellate court may reverse an agency decision if it is arbitrary, capricious, or unreasonable." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013). As the Supreme Court has explained:

> Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role [in reviewing an agency action] is generally restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Id. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

Our review of Board decisions is further limited by N.J.S.A. 48:2-46, which states in pertinent part that the Appellate Division has "jurisdiction to review any order of the [B]oard [of Public Utilities] and to set aside such order in whole or in part when it <u>clearly appears</u> that there was <u>no evidence</u> before the board to support the same reasonably . . . ." (emphasis added). This statute follows the general principle that our courts will not reverse an agency decision just "'because of doubts as to its wisdom or because the record may support more than one result,' but [are] 'obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs.'" <u>In re Adoption of Amendments to N.E., Upper Raritan, Sussex Cnty. & Upper Del. Water Quality Mgmt. Plans</u>, 435 N.J. Super. 571, 583-84 (App. Div. 2014) (alteration in original) (quoting <u>In re N.J. Pinelands Comm'n Resol. PC4-00-89</u>, 356 N.J. Super. 363, 372 (App. Div. 2003)).

A reviewing court "will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein." <u>De Vitis v. N.J. Racing Comm'n</u>, 202 N.J. Super. 484, 489-90 (App. Div. 1985). "[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which

governs." Adoption of Amendments, 435 N.J. Super. at 583 (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001) (citation and internal quotation marks omitted)).

"[J]udicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to . . . deal[] with technical matters that are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues. . . .'" Ibid. (quoting N.J. State League of Muns. v. Dep't of Cmty. Affs., 158 N.J. 211, 222 (1999)) (alteration in original). The burden of demonstrating that the agency's action is reversible "rests upon the [party] challenging the administrative action." Ibid. (alteration in original).

Applying these well-established principles, we discern no basis for disturbing the Board's decision to grant NJNG's MLUL petition because it was reasonably necessary for the service, convenience, or welfare of the public and there was "no reasonable practicable alternative which would have less adverse impact upon the environment or upon the land use and zoning ordinances of the respective counties and municipalities." We therefore reject appellants' arguments on this point substantially for the reasons set forth by the Board in its comprehensive opinion and add the following comments.

In order to be successful on its petition for an exemption from all MLUL provisions and all local regulations and ordinances made pursuant to the MLUL's authority, NJNG had to demonstrate that its SRL project was "reasonably necessary for the service, convenience or welfare of the public," N.J.S.A. 40:55D-19, and that the route designated was "practicable," N.J.S.A. 48:9-25.4.

Construing the language in N.J.S.A. 40:55-50, the predecessor to N.J.S.A. 40:55D-19, the Supreme Court stated:

> 1. The statutory phrase, "for the service, convenience and welfare of the public" refers to the whole "public" served by the utility and not the limited local group benefited by the zoning ordinance.

> 2. The utility must show that the proposed use is reasonably, not absolutely or indispensably, necessary for public service, convenience and welfare at some location.

> 3. It is the "situation", i.e., the particular site or location . . . which must be found "reasonably necessary," so the Board must consider the community zone plan and zoning ordinance, as well as the physical characteristics of the plot involved and the surrounding neighborhood, and the effect of the proposed use thereon.

> 4. Alternative sites or methods and their comparative advantages and disadvantages to all interests involved, including cost, must be considered in determining such reasonable necessity.

5. The Board's obligation is to weigh all interests and factors in the light of the entire factual picture and adjudicate the existence or non-existence of reasonable necessity therefrom. If the balance is equal, the utility is entitled to the preference, because the legislative intent is clear that the broad public interest to be served is greater than local considerations.

[PSE&G, 35 N.J. at 376-77 (citing In re Application of Hackensack Water Co., 41 N.J. Super. 408, 425 (App. Div. 1956)).]

The Court explained:

This exemption section expresses a legislative intent that, in the zoning field, at least some power over a utility is reserved to a municipality, subject to the supervising authority of the Board to declare the local regulation inapplicable if it determines "the situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."

[Id. at 373-74.]

In New Jersey Nat. Gas Co. v. Borough of Red Bank, 438 N.J. Super. 164, 184 (App. Div. 2014), we observed that "[i]t is evident that the Legislature's enactment of N.J.S.A. 40:55D-19 actually increased control over a public utility's use of land within a municipality's borders." These requirements reinforce the Court's recognition that the regulation of public utilities requires a regional approach. Overlook Terrace Mgmt. Corp. v. Rent Control Bd. of Town

of W. N.Y., 71 N.J. 451, 474 (1976); S. Ocean Landfill, Inc. v. Mayor & Council of Twp. of Ocean, 64 N.J. 190, 195 (1974). Viewed through this prism, appellants' arguments opposing the Board's grant of the MLUL petition must be rejected.

PPA and SC first contend that NJNG did not demonstrate a need for a redundant pipeline system because it has never sustained a catastrophic system or supply power failure and could not quantify the likelihood of such an event occurring in the future. Appellants also criticize NJNG because it relied upon Lynch's testimony, rather than that of an independent expert, to show the need for a redundant transmission line. We disagree.

To support a MLUL petition under N.J.S.A. 40:55D-19, an applicant has the burden of showing that "the proposed use is reasonably, not absolutely or indispensably, necessary for public service, convenience and welfare at some location." PSE&G, 35 N.J. at 376-77. The term "public" is expansive, i.e., regional, and does not mean only the local citizenry. Id. at 376. Further, the Board must weigh all of the interests and factors to adjudicate the existence or non-existence of reasonable necessity. Id. at 377.

Lynch, who had over thirty years of experience designing and operating NJNG's system, stated that it would be "irresponsible" planning for NJNG to

41

wait for a catastrophic event resulting in widespread loss of service before taking steps to avoid or mitigate such an event. It was especially ill-advised to wait since NJNG relied on a single interstate feed for nearly all of its gas supply to its customers in the Central and Ocean Divisions.

Lynch also established that there had already been two service interruptions in TETCO's interstate delivery system: the Entriken/ Chambersburg compressor station failures in January 2015, and the Delmont compressor station failure during a 2014 polar vortex. Superstorm Sandy also contributed to Lynch's conclusion that gas-feed redundancy was necessary to avoid potentially devastating effects of a wide-scale supply interruption. Lynch testified that, with a redundant gas feed in place, NJNG could have significantly reduced, or avoided, service interruptions after the storm, since there were significant portions of NJNG's territory "downstream" from storm-damaged areas of the distribution system that were still "viable" and could have remained in operation if there had been an available gas supply. Thus, contrary to appellants' assertions, there was ample evidence in the record to support the Board's conclusion that there was a need for the project.

Appellants argue that the Board should have rejected Lynch's reasoning, explaining that NJNG, during each of TETCO's supply failures, was able to

continue to provide service without a significant interruption. They also claim that Superstorm Sandy does not support the need for the SRL because that storm did not damage transmissions systems and did not interrupt the interstate supply. However, it was not arbitrary or unreasonable for the Board to find that simply because NJNG was able to avoid TETCO's service disruptions, this should prevent it from preparing for a more severe disturbance or showing that the SRL was "reasonably necessary for the service, convenience or welfare of the public" pursuant to N.J.S.A. 40:55D-19. Also, Superstorm Sandy clearly demonstrated the impact and cost that an extensive curtailment of service can have on a public utility's customers.

PPA and SC further claim that the SRL is not necessary because NJNG had previously undertaken six other infrastructure projects known as NJ RISE. However, Lynch testified that the SRL was intended to complement, and not replace, NJ RISE. He explained that NJ RISE was "the name of a group of six NJNG projects approved by the [Board] in 2014 providing system enhancements that improve NJNG's distribution system through storm hardening investments" and "was submitted to the BPU in response to its January 23, 2013 Order inviting regulated utilities to submit 'detailed proposals for infrastructure upgrades designed to protect the State's utility Infrastructure from future Major Storm

43

Events.'"  Because four of those projects were secondary feeds to large single feed distribution systems along the coast, the record supports the Board's finding that the NJ RISE project did not render the SRL unnecessary.

Appellants also argue that because NJNG did not conduct an analysis related to real-world failure scenarios, it could not quantify their likelihood, and thus failed to demonstrate the need for the SRL as a redundant gas feed. However, N.J.S.A. 40:55D-19 only requires NJNG to show that the SRL "is reasonably necessary for the service, convenience or welfare of the public," not that it is likely to experience a major large-scale supply interruption in the near future.  (emphasis added).  The utility need not show that the proposed project is "absolutely or indispensably" necessary.  PSE&G, 35 N.J. at 377.  Also, contrary to PPA's assertion, nothing in NJNG's Distribution Integrity Management Plan, the governing statutes, or applicable case law required NJNG to seek an independent analysis to demonstrate that there was a likelihood of a major supply system interruption to establish the need for the SRL.  Therefore, the Board appropriately relied upon Lynch's detailed testimony.

As explained above, we will not reverse an agency decision because of doubts as to its wisdom or because the record may support more than one result. Adoption of Amendments, 435 N.J. Super. at 583-84.  We do not weigh the

44

evidence, draw inferences and conclusions from the evidence, or resolve conflicts therein. De Vitis, 202 N.J. Super. at 489-90. N.J.S.A. 48:2-46 states that the Appellate Division can set aside the Board's order only "when it clearly appears that there was no evidence before the board to support the same reasonably." In light of these standards, we are satisfied that the Board did not err by concluding that the SRL was reasonably necessary as a redundant gas feed pursuant to N.J.S.A. 40:55D-19.

Appellants next argue that NJNG failed to adequately consider alternative routes for the proposed pipeline and, therefore, the Board should have denied its MLUL petition. Again, we disagree.

To support a MLUL petition under N.J.S.A. 40:55D-19, an applicant has the burden of showing that no alternative route has less impact on the environment or on the community. PSE&G, 35 N.J. at 368. Objectors to the petition have the burden of showing the existence of a feasible alternative site. Hackensack Water Co., 41 N.J. Super. at 425-26. Furthermore, under N.J.S.A. 48:9-25.4, the Board can designate the locations to be used for a pipeline transmitting natural gas service if that route is "practicable."

At the evidentiary hearing, NJNG presented an expert report prepared by AECOM and testimony by Baker on alternative routes for the pipeline. The

report examined five alternate routes for the first section of the pipeline and four alternate routes for the pipeline's second section. As previously discussed, AECOM evaluated these routes using numerous quantitative factors: (1) built environment (i.e., historical properties within 150 feet, school churches and properties within 150 feet, residences within 150 feet, number of parcels crossed, commercial and industrial buildings within 150 feet, and length within state, county or agricultural preserved lands); (2) natural environment (i.e., land-use/land-cover forests, stream crossings, land-use/land-cover wetlands, flood zones and proximity to threatened and endangered species habitat); and (3) engineering variables (i.e., miles within existing ROWs, miles paralleling existing transmission line ROWs, number of bridge crossings, number of major utility crossings, and length of pipeline in acidic soils).

The report also considered qualitative factors, including: visual concerns; community concerns; special permit issues; construction/ maintenance accessibility; and schedule delay risks. After weighing the importance of each of those factors, AECOM determined that the route NJNG selected for the SRL was the most feasible.

PPA asserts that the methodology AECOM used to compare the various alternative routes was intentionally biased so as to make the JCP&L ROW Route

A-3666-15

appear more unattractive. The JCP&L ROW Route, however, was included as part of one of the original batch of alternatives and, therefore, AECOM had already devised its methodology prior to any proposal made by the municipalities to use that route. Thus, there was no bias.

PPA further argues that the Board failed to consider the alternative route proposed by the municipalities, Section One, Route D. However, Route D was not a feasible or practicable alternative because the pipeline would cross preserved farmland and environmentally sensitive lands.

Under the ARDA, pipeline construction on preserved farmland is prohibited. The ARDA coordinates the development of county farmland preservation programs within certain areas where agriculture is presumed the first priority land use. N.J.S.A. 4:1C-12(c); Twp. of S. Brunswick v. State Agric. Dev. Comm., 352 N.J. Super. 361, 364-65 (App. Div. 2002). In N.J.S.A. 4:1C-12, the Legislature found:

> a. The strengthening of the agricultural industry and the preservation of farmland are important to the present and future economy of the State and the welfare of the citizens of the State, and that the Legislature and the people have demonstrated recognition of this fact through their approval of the "Farmland Preservation Bond Act of 1981," . . . ;

b. All State departments and agencies thereof should encourage the maintenance of agricultural production and a positive agricultural business climate;

c. It is necessary to authorize the establishment of State and county organizations to coordinate the development of farmland preservation programs within identified areas where agriculture will be presumed the first priority use of the land and where certain financial, administrative and regulatory benefits will be made available to those landowners who choose to participate, all as hereinafter provided.

Landowners may petition the County Agricultural Board and/or the municipality for the creation of a farmland preservation program or municipally-approved program. N.J.S.A. 4:1C-20 to -21. Owners of land within a "municipally approved program or other farmland preservation program" may enter into an agreement with the County Agricultural Development Board and, if necessary, the municipality "to retain the land in agricultural production," as part of the sale of a development easement to the county or a non-profit organization. N.J.S.A 4:1C-24(a)(1); N.J.S.A. 4:1C-31. That development easement runs with the land and is "binding upon the landowner and every successor in interest." N.J.S.A. 4:1C-32. Consequently, land preserved for agricultural development cannot be used to develop non-agricultural public utility infrastructure, nor can a public utility acquire an interest in property,

preserved pursuant to ARDA, for a non-agricultural purpose such as constructing a natural gas transmission line.

Furthermore, a public utility cannot exercise its power of eminent domain to acquire an interest in preserved land under N.J.S.A. 4:1C-25, which states:

> The provisions of any law to the contrary notwithstanding, no public body shall exercise the power of eminent domain for the acquisition of land in a municipally approved program or from which a development easement has been conveyed pursuant to section 17 of P.L.1983, c. 32 (C.4:1C-24), nor shall any public body advance a grant, loan, interest subsidy or other funds within a municipally approved program, or with regard to land from which a development easement has been conveyed pursuant to section 17 of P.L.1983, c. 32 (C.4:1C-24), for the construction of dwellings, commercial facilities, transportation facilities, or water or sewer facilities to serve nonfarm structures unless the Governor declares that the action is necessary for the public health, safety and welfare and that there is no immediately apparent feasible alternative. If the Governor so declares, the provisions of section 12 of P.L.1983, c. 32 (C.4:1C-19) shall apply.

Moreover, Section One, Route D required the pipeline to cross the most streams, wetlands, and lands with threatened and endangered species habitats. In his report, Baker assigned Route D a high value with respect to special permits because it crossed a considerable length of preserved farmlands restricted to agricultural use and environmentally sensitive lands. Thus, the Board did not err by concluding that Route D was not feasible.

A-3666-15

Therefore, we are satisfied that the evidence supported the Board's determination that NJNG met its burden to show that "its proposed routing [was] reasonable, and that no alternative route is less intrusive to the environment or community."

Finally, appellants assert that NJNG intends to use the SRL only for profitability and not for reliability, which they claim proves that the Board's conclusions are arbitrary and capricious because the SRL link is not "necessary to maintain reliable . . . natural gas supply service for the general public," or "necessary for the service, convenience or welfare of the public." PPA and SC further assert that the size of the proposed SRL is larger in capacity than NJNG needs to provide any redundant service to its existing customers, which supports the company's intent only to grow its business. These contentions lack merit.

There is nothing in N.J.S.A. 40:55D-19 or in PSE&G, 35 N.J. at 376-77, that prevents a gas transmission company from making a profit or from attracting new customers by installing a new transmission line. As we stated previously, NJNG must show only that the SRL link is "reasonably, not absolutely or indispensably, necessary for public service, convenience and welfare." PSE&G, 35 N.J. at 377.

Moreover, NJNG offered sufficient evidence justifying its decision to install a thirty-inch, rather than a twenty-four-inch, transmission pipeline. First, NJNG demonstrated that a thirty-inch diameter line was necessary to meet its peak demand by presenting "iterative flow modeling," showing various hypothetical demand and supply situations modeled on its current system with the SRL in place.

Second, a thirty-inch diameter pipeline was equal to NJNG's existing system connector with TETCO's interstate pipeline in Middlesex County and other recently installed segments. Third, NJNG showed that a thirty-inch diameter pipeline would allow greater capacity from new interstate suppliers in the future. Based on this evidence, it was certainly within the Board's discretion and expertise in reviewing the construction and development of natural gas transmission lines to find, contrary to appellants' claims, that a 180,000 Dth/day contract was not an appropriate tool to determine the correct size of the pipe for the project. Thus, the Board did not err by finding that the proposed thirty-inch SRL was reasonably necessary as a redundant gas feed pursuant to N.J.S.A. 40:55D-19.

The Division of Rate Counsel argues that because a smaller diameter line would be sufficient to transport the amount of gas set forth in the NJNG contract,

only the cost of a twenty-four-inch line should be borne by ratepayers. However, as Rate Counsel concedes in its brief, "this matter is not a base rate proceeding" and, therefore, there is no need to address this contention further here.

## VI.

All other arguments raised in this appeal, to the extent we have not addressed them, are without sufficient merit to be discussed. R. 2:11-3(e)(1)(E).

## VII.

In sum, we affirm the Board's March 18, 2016 decision and order granting NJNG's MLUL petition. The Board's decision is supported by sufficient credible evidence in the record and is neither arbitrary, capricious, nor unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3666-15